De Witt *v.* Van Sickle.

## Sarah N. De Witt

*v.*

## William Van Sickle and others.

1. An assignee of a mortgage takes it subject to all defences existing against the mortgagee in favor of the mortgagor, but free from latent equities existing in favor of third persons.

2. A mortgage executed as a step in a scheme to defraud creditors, will be upheld, even against creditors, in the hands of a *bona fide* assignee for value; but, in order to be considered an assignee for value, he must pay money, surrender a valuable right, or assume an irrevocable obligation; the surrender of a pre-existing debt is not a sufficient consideration.

3. Property conveyed in fraud of creditors will be reclaimed for the benefit of creditors, no matter who may happen to hold it, if reclamation can be effected without injustice to innocent third persons.

4. He who buys any part of the avails of a scheme to defraud creditors, in order to keep what he gets, must not only pay for it, but he must be innocent of any purpose to further the fraud.

5. A person who willfully closes his eyes to avoid seeing what he believes he would see if he kept them open, must be considered to have seen what any man with his eyes open would have seen.

On final hearing on bill, answers and proofs.

14

De Witt *v.* Van Sickle.

*Mr. De Witt* and *Mr. A. T. McGill*, for complainant.

*Mr. Lewis J. Martin*, for Simeon Garrison.

*Mr. Lewis Cochran*, for the other defendants.

In March, 1875, William Van Sickle sold and conveyed all his real and personal property to his son Andrew, who, with his wife, up to that time, had been members of his father's family. Andrew was without any means whatever, except an alleged claim against his father for wages. The consideration for the personal property was $1,800, which was, it is said, by an arrangement between the father and son, to be paid by the son to certain of the father's creditors in satisfaction of their debts. It was, in fact, almost entirely absorbed in paying a single creditor, who, shortly after the sale, procured both the father and the son to execute a chattel mortgage on it. For the real estate, it is said, the son agreed to pay $8,700, in addition to the mortgages on it. Of this sum $2,000 were paid by an allowance to the son for wages; $2,000 more were secured by a mortgage bearing interest from April 1st, 1876, and payable in installments of $500 each, the first falling due April 1st, 1879, and the last April 1st, 1883; $2,200 additional were secured by a mortgage requiring the son to support and maintain his father and mother during their several lives, and to provide a decent burial for each at death, or, on failure, to pay the $2,200, with interest from the time of default; and the remaining $2,500 were secured by a mortgage bearing interest from April 1st, 1875, and payable in installments of $500 each, on the same days that the principal of the $2,000 mortgage was payable. In May, 1875, the mortgage for $2,000 was assigned by the father to Simeon Garrison, in payment of a debt of $1,778.78, due from him to Mr. Garrison, and $102.62 in cash. The $2,500 mortgage was cancelled July 30th, 1875, it being alleged that the son, prior to that date, had assumed to pay, and had paid, debts of his

father in excess of the sum secured by it. In February, 1876, the father released all his rights under the mortgage for $2,200, and the son thereupon executed a mortgage to Adam T. Cortright and four other creditors of his father, securing debts due to them amounting, in the aggregate, to $1,115. The release and mortgage were executed while the father was under examination on proceedings supplementary to execution. The complainant recovered a judgment against William Van Sickle, in November, 1875, for a debt contracted in 1868, and her bill, in this case, is filed to set aside the several conveyances mentioned, and to have her judgment charged against the lands. At the time the father transferred his property to his son, he was unable to pay his debts.

THE VICE-CHANCELLOR.

The transactions sought to be invalidated in this case stand, in all material respects, between the original parties, identical with those denounced as fraudulent in *Owen* v. *Arvis*, 2 *Dutch.* 22, and that case must rule this. The doctrines of that case most pertinent to this were emphasized by the court of errors and appeals, in *National Bank of the Metropolis* v. *Sprague*, 6 *C. E. Gr.* 530, and have, therefore, in this forum, the force of unquestionable law.

According to the rule laid down in the case last mentioned, it cannot be disputed that William Van Sickle, at the time he executed the deeds assailed here, was insolvent. The proofs render it perfectly clear he was unable at that time to meet his pecuniary engagements, and that if his affairs had then been wound up he could not have paid his debts.

I am also satisfied that the deeds and mortgages interchanged between the original parties were fraudulent, in fact, against the creditors. The real character of the transaction is seen, conspicuously, in the $2,200 mortgage, whereby a debtor, unquestionably insolvent, attempted to appropriate that amount of his property to the benefit of his wife

and himself, during their several lives, in defiance of the rights of his creditors.

It is obvious, I think, the mortgagees named in the Cortright mortgage can lay no claim to the character of *bona fide* mortgagees under the fifteenth section (the sixth, before the revision,) of the statute of frauds (*Rev.* p. 447). There is enough in the time and circumstances attending its execution and registry to warrant the belief that its execution was a more desperate device against creditors than the original scheme. That mortgage cannot be permitted to stand against creditors.

The only question of difficulty in the case relates to the rights of the defendant Garrison. He claims to be the assignee for value, and without notice of the $2,000 mortgage made by the fraudulent grantee to the fraudulent grantor as security for part of the purchase-money. While I think it is debatable whether the assignee of a mortgage, made by a fraudulent grantee to a fraudulent grantor, as a step in a scheme to defraud creditors, can acquire the precise rights and immunities conferred by the statute on a *bona fide* mortgagee, still, it must be admitted, as an undoubted principle of equity jurisprudence, that though an assignee of a mortgage takes it subject to all the defences which would exist against it if it had remained in the hands of the original mortgagee, yet, if he takes it innocently and for value, he acquires a title free from all latent, equities existing in favor of third persons. *Woodruff* v. *Depue*, 1 *McCart.* 168; *Shannon* v. *Marselis, Sax.* 414; *Cornish* v. *Bryan*, 2 *Stock.* 146; *Wilson* v. *Hill*, 2 *Beas.* 143. It must, therefore, be conceded that Mr. Garrison could, by the purchase of this mortgage, acquire rights entitled to protection, even against the creditors intended to be defrauded by its execution. This brings us to the question, was he a purchaser for value? He admits he paid the whole of the purchase-money, except $102.62, with the notes of the assignor. The surrender of a pre-existing debt is not sufficient to give him the character he claims. *Mingus* v. *Condit*, 8 *C. E. Gr.* 313; *Pancoast* v. *Duval*, 11 *C. E. Gr.*

De Witt *v.* Van Sickle.

445.   The reason is, by refusing to give the security any greater virtue in his hands than it had in the hands of the original mortgagee, he is put in no worse condition than he was before he obtained it; in the language of some of the judges, he is not hurt.   The mortgage in the hands of the fraudulent grantor was unquestionably void against creditors.   To give it any greater force' against creditors in the hands of his assignee, it must be shown to have acquired a new virtue or equity, and this can only be imparted to it by the actual payment of money, the surrender of a valuable right, or the assumption of an irrevocable obligation.   2 *Lead. Cas. in Eq.* (4 Am. ed.) 82.   Such new equity can only arise when a third person has, by an innocent purchase of the security for value, placed himself in a position from which it is impossible to extricate him without loss; but if, by declaring the paper still infected with its original infirmity, he is left just where he was when he took it, he suffers no hurt, and the court is bound to declare it invalid. Creditors may then have justice without injustice to him. Equity will give validity to that which would otherwise be invalid only when it is clearly necessary to prevent loss to an innocent person.   A debtor who attempts to discharge his debt by passing to his creditor a security which he has created as part of the means to defraud his creditors, does not discharge it.   The debt due to Mr. Garrison in this case has not been discharged.

I confess I am unable to appreciate the argument intended to show that the application of the rule just adverted to is limited to titles and securities executed by the fraudulent grantee, but has no application to those obtained from the fraudulent grantor.   It is true, Chancellor Kent, in construing a similar statutory provision, drew a distinction between the rights acquired by a purchaser from the fraudulent grantor and those acquired by a purchaser from the fraudulent grantee, holding that a purchaser from the former was entitled to the protection of the statute, while a purchaser from the latter was not.   *Roberts* v. *Anderson,* 3 *Johns.*

*Ch.* 371. But on appeal, this view was repudiated (18 *Johns.* 515), it being held by the court of errors and appeals that a purchaser from either was within the protection of the statute. And that is the rule in force in this state. *Phelps* v. *Morrison*, 10 *C. E. Gr.* 538. The limitation contended for would render the rule nugatory as a principle of justice, and so shorten the arm of the law that it would be impossible to do justice in many cases.

The great purpose of the rule is to give the courts power to reclaim, for the benefit of creditors, all the property of a debtor aliened in fraud of their rights, regardless of who may happen to hold it, when reclamation can be effected without injustice or injury to an innocent person. Whether the avails of the fraud are held by the vendees of the fraudulent grantee or the fraudulent grantor, is a matter of no significance whatever. Creditors have a right to have them sequestered for their benefit, no matter who holds them, unless their right is encountered by a right founded in a superior equity. Paying for them by the mere surrender of a debt due by one of the fraud-doers, does not give such right. To divest the right of a purchaser who pays in this mode, merely puts him back where he was before his purchase. His claim remains intact against his debtor. He is not harmed, but simply remitted to his original position. And it seems he will be sent back there, even if he is put in a position less fortunate than that he occupied originally. Justice Potts, in *Owen* v. *Arvis*, declared, and his declaration is quoted approvingly by the justice who pronounced the judgment of the court of errors and appeals in *National Bank of the Metropolis* v. *Sprague*: "That the debtor subsequently, in pursuance, as he says, of his intention at the time of the conveyance, assigned the mortgage to a portion of his creditors, does not purge the fraud. If the creditors who accepted the compromise offered them have been thereby placed in an unfortunate position, it is to be regretted; but we might as well repeal the statute of frauds entirely as to permit it to be thus evaded." So far as Mr.

De Witt *v.* Van Sickle.

Garrison's title to the mortgage depends on the surrender of a pre-existing debt, it is clear it is without equity against creditors and cannot be upheld.

But he is a purchaser for value to the extent of $102.62. It is undisputed that he paid that sum on the transfer of the mortgage. He has a right, therefore, to hold it for that amount if he purchased without notice of its true character. A person who deals in the avails of a scheme to defraud creditors, to keep what he gets, must not only pay for it, but he must be innocent of any purpose to further the fraud, even to protect himself. Actual notice need not be shown. If the purchaser has before him, at the time of his purchase, facts and circumstances from which a fraudulent intent, either past or present, on the part of the vendor, is a natural and legal inference, or such facts or circumstances of suspicion as would naturally prompt a prudent mind to further inquiry and examination, which, if pursued, would lead necessarily to a discovery of the corrupting facts, he is chargeable with notice. *Tantum* v. *Green*, 6 *C. E. Gr.* 364. A person who willfully closes his eyes to avoid seeing what he believes he would see if he kept them open, must be considered to have seen what any man with his eyes open would have seen. Did Mr. Garrison, at the time he negotiated the purchase of this mortgage, have notice that his assignor was insolvent at the time he and his son perfected the scheme of which this mortgage formed a part? This is the only material question on this branch of the case. The mortgage declared its purpose on its face. The fact that the sum secured did not bear interest for a year, and that part of the principal was not payable, and therefore not available for a period of eight years after its date, gave unmistakable evidence of its purpose to any person who knew that it was a step in a scheme by which an insolvent debtor had transferred all his tangible property to his son, who was without means, and who, with his wife, up to the time of the execution of the mortgage, had lived as members of his father's

family.    Notice of insolvency, under such circumstances, was notice of the corrupt purpose of the arrangement.

Mr. Garrison lived near the debtor, only two or three miles distant, near enough to hear all the gossip which such a complete surrender of the debtor's property to his son would be likely to provoke.   He says he thought his debtor was able to pay all his debts, and yet he held three notes against him, one of $300 and two of $500 each, upon which no interest had been paid for over five years.    When he received the assignment the interest on his debt exceeded one-third of its principal sum.    It rarely happens that a creditor, who desires the payment of his debt at all, extends such extraordinary indulgence to a solvent debtor.    If the debtor is insolvent, the creditor waits because he must, but not if the debtor is able to pay.    Delay in the payment of interest is always regarded as evidence of pecuniary embarrassment and weakness, and when it spans a period of over five years it would seem to approach such a complete demonstration of insolvency as to dissipate all hopes and doubts upon the subject.    No persons are more disturbed by such evidence than the class to which the creditor in this instance belongs.    He is neither a careless nor improvident person. It cannot be doubted his debtor's delay produced anxiety and provoked inquiry.  Indifference to his debtor's pecuniary situation, would, under the circumstances, have evinced extreme folly.    Mr. Garrison cannot be accused of folly, nor an unnatural indifference to what deeply concerned him. He must be presumed to have exercised that degree of watchfulness over the pecuniary condition of his debtor which a man of ordinary prudence, in his situation, with his inducements and opportunities, would have done.    I think, therefore, he is chargeable with knowledge of his debtor's actual condition.    If he was ignorant, it was the result of design.    I am glad to believe he spoke truthfully when he said he thought his debtor would be able to pay all his debts, but it is obvious his opinion was founded rather on his hopes than on the facts.    According to the

facts, his hopes were mere illusions. He took the mortgage, in my opinion, with knowledge of such facts and circumstances as strips him of all equity against the complainant.

The conveyances made by the father to the son, and the mortgages made by the son to the father, and to the father and mother, as well as the mortgage made by the son to Mr. Cortright and others, and the assignment to Mr. Garrison, will be declared void against the complainant, and the amount due on her judgment, together with the costs of this suit, will be charged against the lands.