KATE FAULKNER, respondent,

*v.*

JOHN WASSMER et al., appellants.

[Submitted April 5th, 1910. Decided July 8th, 1910.]

1. A purchaser who has a right to elect whether or not he will rescind a sale because of material misrepresentations must exercise such right with reasonable promptness, otherwise his delay in so doing will afford plenary proof of an election not to rescind which is final. The delay to which this probative force is given is that which arises from the vendee's failure to rescind during the period of time within which one would naturally act who knew that to act effectively he must act promptly.

2. The distinction pointed out between the rescission of a contract and an action for deceit in respect to the compensation recoverable.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Howell, whose opinion is as follows:

"HOWELL, V. C. (orally).

"This bill is filed by Mrs. Faulkner, the wife of Alfred Faulkner, against John Wassmer and Henry M. Radcliffe for the purpose of rescinding a deed of conveyance of lands on Smith street in the village of Irvington. The deed was dated on the 1st day of July, 1908; was acknowledged on the 9th day of July, 1908, and was recorded on the same day. It conveys to Mrs. Faulkner a lot of land on Smith street subject to certain restrictions which are fully set out in the deed and are fully copied in the bill of complaint. The evidence shows that Mr. Faulkner first saw the land in question about the 4th day of May, 1908, and that within a day or two after that he saw Mr. States, who is a real estate agent, and who was specially authorized by Mr. Wassmer and Mr. Radcliffe to make sales of the lands in question. The bill charges that Mr. Wassmer and Mr. Radcliffe were partners in this enterprise, although the lands which they were disposing of were held in severalty by them.

Mr. Faulkner had notice that the lands were restricted.  He saw a large sign on one of the lots near the corner of Smith street and Clinton avenue which contained the information that the land in that neighborhood was restricted land.  In order to ascertain what the restrictions were he went to see Mr. States, who showed him a typewritten copy of the restrictions and stated to him that the land in that neighborhood was restricted in that manner, and Mr. Faulkner says in addition to that that Mr. States told him that the restrictions were matters of record. Some days after that, one evening while Mr. and Mrs. Faulkner and their daughter were examining the premises, Mr. Wassmer appeared and there was still further conversation about the restrictions; and on those occasions, one or more of them, the extent of the tract of land owned by them and so restricted was talked about and the extent and area of the restrictions discussed.   The evidence indicates to my mind that probably Mr. Wassmer and Mr. Radcliffe intended to restrict the whole tract by a general scheme which was embodied in the typewritten statement that they gave to Mr. States to show to intending purchasers.   Now that was the situation at the time that Mr. Faulkner paid the first twenty-five dollars; that I think was on the 5th day of May, 1908, and Mr. Faulkner is chargeable with notice of restrictions of some sort or other by the receipt which he took at that time, because that states that the conveyance was to be made subject to restrictions, a copy of which had been previously shown to him by Mr. States in his conversation with Mr. States; but I think on the whole that Mr. Faulkner acting on behalf of his wife, and Mrs. Faulkner acting on her own behalf, were justified in believing that the tract of land which was pointed out to them by Wassmer and by States as the tract of land that was owned by Wassmer and Radcliffe was restricted throughout in accordance with the restrictions that were shown to them by Mr. States.   They were under no obligation (as contended by the complainant) to go to the public records to find out whether the restrictions were on record.   They had the right to rely on the statements made to them by Mr. States and the owner of the property.

"Now I take it that there was a representation made by Mr. Wassmer and Mr. Radcliffe either personally or through their agent that this whole tract was restricted in accordance with the plan of restrictions disclosed by Mr. States. I think that was a statement which led the Faulkners to make the purchase; I think that was a statement of a material fact, and that a misrepresentation in regard to it would entitle them to relief. Now what is meant by restrictions, restrictions of the whole tract? Why, surely; not something that is temporary, but something that is permanent, something that runs with the land, something that is enforcible by somebody, and in this case I should say enforcible by Mrs. Faulkner, the purchaser of a portion of the restricted land. And it becomes a very material fact in the case, I think, to determine just exactly what is meant by the statement that was made to them by Mr. States and by the owners. I think that there was a statement made that the whole tract was restricted, and that they had a right to act upon the statement and to pay their money and close up the deal, believing that that statement was true.

"Now what was the situation at the time the statement was made? The statement was made I believe in the early part of May, 1908. At that time a lot had been agreed to be sold to Mr. Krah by an agreement in writing which contained no restrictions whatever. I do not see how I can keep the *Krah Case* out of this case. It was tried before me by counsel who is engaged in this case; the defendants were the same persons who are the defendants in this case, and I hardly see how I can say that I do not know about it. That case came to a final hearing, and under the circumstances and under the evidence in that case the opinion of the court was that Mr. Krah was entitled to a deed containing no restrictions. See *Krah* v. *Wassmer*, *75 N. J. Eq.* (*5 Buch.*) *109*. Now, it appears also that at that time (that is, at the time of the delivery of the Faulkner deed) a conveyance had been made to Mr. Williams, also without restrictions. It also appears by the testimony in this case that there were three mortgages made upon three separate parcels of land belonging to this tract to three several building and loan associations. Those three mortgages were put in evidence, and it appears upon

an inspection of them that they contained no restrictions. It also appears by the evidence of Mr. Wassmer himself that there are upon the tract or were then upon the tract other mortgages, and that the whole number put by them upon the property was thirteen or fourteen, and that none of them contained any restrictions. I consider that a very important element in this case. While it is true, as is argued on behalf of the defendant, that mortgages are mere security for the repayment of moneys loaned on the faith of them, it is likewise true that at law the mortgagee has an additional right, namely, to take possession of the property mortgaged in case of a default; in such case he may foreclose his mortgage, and the person who takes the sheriff's deed would take title free and clear of all the restrictions, unless it could be shown positively and directly that the building and loan association was duly informed of the restrictions at the time it took its mortgage. That brings up another question, too; whether by the making of those mortgages without restrictions the defendants evinced an intention to abandon the restrictions. It is difficult to say whether it would have that effect, whether it would have the effect of an abandonment from the view point of their intention; but from the view point of actuality is it not an abandonment? Is it not a giving up by them of their right to control these mortgaged premises? Although they may have been conveyed subsequently to the making of the mortgages, subject to restrictions, would not a foreclosure of the mortgage cut out the restrictions? I mean actual restrictions put in a deed after a mortgage was made—wouldn't a foreclosure of a mortgage cut out those restrictions? That I understand is the situation. There may be some doubt as to whether the intention that Mr. Wassmer and Mr. Radcliffe had in mind to restrict this property was given such publicity and efficiency as to bind people who should purchase a portion of the property. Of course I do not think it would bind people to whom no notice of it ever came; but it could hardly be said that Mr. Wassmer could have restricted his property by keeping in his own mind the fact that he did restrict it, and that he intended to restrict it, without doing something to actually restrict it. What did he do when the building and loan associations came to examine the prop-

erty? He remembers one case in which he notified the examining committee of the building and loan association that the property was restricted, but they were very careful not to put any restrictions in their mortgage; and I doubt whether notice to the committee would be notice to the building and loan association anyhow.

"So that I am very clear that there was a representation made by the defendant Wassmer of a material fact which at the time it was made was untrue, and that the complainant is entitled to a rescission of the contract upon equitable terms.

"The defendants say that the bill is filed for the purpose of recovering damages—no, not for the recovery of damages, much less for the recovery of unliquidated damages, because if there are any damages following in the trail of this transaction, as set out in the bill, they are not unliquidated damages. It is very well settled in New Jersey now by the recent decision of our court of appeals that this court will not entertain a suit for unliquidated damages, but will entertain a suit for liquidated damages, damages that can be liquidated, damages of a variety that do not have to go to a jury.

"There are some expenditures here which seem to me to be chargeable against the two defendants, and I say the two defendants because they are charged in the bill as partners, and they admit by the answer that they are partners in this whole enterprise; and therefore whatever personal claim would run against anybody would run against both of them. Therefore I say that the complainant on the rescission of this deed of conveyance would have a right to charge against both of these parties whatever amount of money was paid out by her, necessarily paid out by her on the faith of the instrument, because I am going to limit it to the necessity—necessarily paid out by her in consequence of the making of the contract and the deed.

"It is impossible from the testimony for me to tell now just what those items would be, and it will have to be referred to a master for the purpose of ascertaining the same, unless counsel can agree.

"One of the defences that is set up is the defence of acquiescence, and consequently of laches. The doctrine relating to that

question is pretty well settled in New Jersey in the case of *Dennis* v. *Jones, 44 N. J. Eq. (17 Stew.) 513.* In *Dennis* v. *Jones* there was an attempt made to set aside a chattel mortgage on the ground of fraud, and there the question of laches was discussed, and it was held that in case of a rescission the party rescinding the contract must bring his suit at the very earliest possible moment. But I do not think a delay from August until November is such a delay as would admit the defence of laches. It is not shown that during that period the defendant's situation was changed at all, and it does not appear that the delay has caused the defendants any damage.

"I will advise a decree in accordance with these views."

From this decree the defendants have appealed.

*Mr. Frank E. Bradner,* for the appellants.

*Messrs. Osborne & Astley,* for the respondents.

The opinion of the court was delivered by

GARRISON, J.

We agree with the learned vice-chancellor that Mrs. Faulkner purchased the lot in question upon an untrue representation of such a nature that, upon the discovery of its untruth, she was entitled to elect to rescind the sale. We do not, however, agree that such election was still open to her four months later when the present bill of complaint was filed declaring for the first time her election to rescind. At this time, viz., November 28th, 1908, her right to elect, which arose on or about July 10th, 1908, no longer existed, not upon the doctrine of laches, discussed in the conclusions filed in the court below, but upon the ground that the lapse of such a length of time under the circumstances afforded plenary proof of an election by her not to rescind to which conclusive effect should have been given.

The learned vice-chancellor was in error in testing the complainant's right to elect solely by the doctrine of laches and notably so in conceiving that the decision of this court in *Dennis* v. *Jones, 44 N. J. Eq. (17 Stew.) 513,* turned upon that doctrine

which, in point of fact, was not even mentioned in the opinion of Chancellor McGill in this court. *Dennis* v. *Jones* was decided not upon the *quasi*-estoppel that is involved in the doctrine of laches, but upon a totally different ground, viz., that of conduct-evidence.

Authorities cited by Chancellor McGill had settled the law "that the defrauded party to a contract has but one election to rescind, that he must exercise that election with reasonable promptitude after the discovery of the fraud and that when once he elects he must abide by his decision;" other cases cited in the opinion had held that "delay in the rescission of the contract is evidence of a waiver of the fraud and an election to treat the contract as valid." The approval and adoption of both of these lines of decision by this court in *Dennis* v. *Jones* resulted in our holding "that, after the appellants had knowledge of all the substantial features of the alleged fraud and were fully aware of the deceit which had been practiced upon them, they so acted as to afford plenary evidence of an election to abide by their contract," and that "their election thus made was irrevocable."

It is this rule, and not the doctrine of laches, that *Dennis* v. *Jones* lays down and illustrates.

To the same effect is the more recent case of *Clampitt* v. *Doyle,* 73 *N. J. Eq.* (3 *Buch.*) 678. The rule of *Dennis* v. *Jones* is so clearly stated by Chancellor McGill that in actual practice the only question likely to arise is whether or not the delay was such as to warrant its application, *i. e.,* whether the vendee's failure to act extended beyond the period within which one would naturally act who knew that to act effectively he must act promptly. The question in itself is not peculiar to this class of cases; it is present in all cases involving a reasonable time, concerning which, it is admitted, that no hard and fast rule obtains and also that the difficulty that exists in cases that lie close to the line disappears with the lapse of time that has been permitted to intervene. Thus the question whether a landowner, who is under a duty to make repairs upon notice, is in default on the very day he had notice or the day after may present difficulties that entirely disappear if he has suffered weeks and months to

elapse. The case before us is of this latter character in that an election that could in reason have been made within a few days, or at most a few weeks after the right to make it arose, was, without any adequate excuse that was consistent with promptitude of action, delayed for months. It is precisely this conduct that (as we decided in *Dennis* v. *Jones* and *Clampitt* v. *Doyle*) affords plenary proof of an election to abide by the contract, which is irrevocable. For this reason the 'bill of complaint should have been dismissed by the court of chancery, and for this reason the decree of that court must be reversed.

This result renders it unnecessary to do more than allude to the fact that the prayer of the complainant's bill with respect to the several sums to be paid to her by the defendants in excess of purchase price, interest, insurance and taxes, is made up for the most part, if not wholly, of items for which a court of equity, upon the rescission of a contract, gives no compensation; as to some of them, because they are in the nature of unliquidated damages, and as to others, because of the essential difference in this respect between the rescission of a contract and an action for deceit based thereon.

To obtain the former, the complainant must show a material misrepresentation not necessarily untrue to the knowledge of the defendant; whereas the gist of the action for deceit is conscious falsification—hence the injured party may not, by selecting the action that is the more easily proved, obtain in equity the measure of redress that is recoverable only when the more onerous burden has been sustained in a court of law. This distinction is pointed out in *Redgrave* v. *Hurd, 20 Ch. Div. 1; Newbigging* v. *Adam, 34 Ch. Div. 582; 13 App. Cas. 308,* and is treated extensively in the notices in *6 Eng. Rul. Cas. 754 el seq.*

The theory of the complainant's bill as exemplified by its specific prayer for relief is entirely indefensible, and the decree, therefore, granting such relief in general terms is, upon its face, erroneous.

The learned vice-chancellor, however, in his conclusions expressly disavowed the purpose of allowing unliquidated damages, and confined his order of reference to such improvements as were

the "necessary and proper consequences" of the sale that was set aside. Inasmuch, however, as "necessary" is quite generally construed to mean "suitable," rather than "indispensable" (*New Jersey, &c., Railroad Co.* v. *Hancock, 35 N. J. Law (6 Vr.) 537; Camden, &c., Railroad Co.* v. *Woodruff, 36 N. J. Law (7 Vr.) 94; Morris, &c., Canal Co.* v. *Love, 37 N. J. Law (8 Vr.) 60*), it may be doubted whether the error of the decree was thereby removed or rendered harmless to the defendant. The matter, however, need not be further pursued since the decree must be reversed and the bill dismissed for the reason first given. To this end the decree is reversed.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, VROOM, GRAY, CONGDON—13.