This is a suit for rescission of a contract of insurance issued by the complainant on the life of John Joseph Cronin, deceased, the husband of the defendant.
Decedent, on December 5th, 1941, applied to complainant for a life insurance policy for $10,000 (Exhibit C-1). On September 27th, 1943, one year and ten months after the issuance of the policy, he died of coronary thrombosis. After his death the complainant refused to pay the amount of the policy, urging as a reason therefor, that the decedent in his application for insurance had misrepresented material facts. These misrepresentations substantially are as follows: (1) *Page 587 
decedent indulged in intoxicants, although his application says he did not; (2) he had been treated by a doctor within five years prior to the date of the application for insurance, whereas his application says he had not; and (3) he had been in a hospital for treatment within five years of the time he had applied for insurance, while his application says he had not been under treatment in a hospital within that time.
The decedent's widow, the beneficiary in the policy, instituted an action at law to recover the amount due on the policy. The insurance company filed an answer and counter-claim therein alleging misrepresentation. Then it subsequently filed the present bill of complaint praying for (and obtaining) a restraint of the law action, and a rescission of the contract, and at the same time it tendered a return of the premiums to the defendant widow.
The defendant in her answer to the bill denies the alleged misrepresentations, and asserts the insurance company, through its agents, had knowledge of the actual facts, notwithstanding the contents of the application. She contends no fraud exists by virtue of the fact that the complainant did not rely on the alleged misrepresentations. She says it had made an independent investigation of the contents of the insurance application, which, among other things, covered the decedent's medical history. The investigation is contained in a report dated December 17th, 1941 (hereinafter called the O'Hanlon report), which report is in complainant's possession (Exhibit D-1). The defendant, by way of counter-claim, seeks to reform that part of the application wherein the misrepresentations are alleged, and prays for a judgment in the sum of $10,000 on the theory that equity having taken jurisdiction, will give full and complete relief.
The O'Hanlon report disagrees with the decedent's application in the following respects:
(1) The application shows the decedent's employment to have been that of a stock broker (Exhibit C-2, question No. 4); while the O'Hanlon report of the investigation shows that the decedent had been unemployed (Exhibit D-1, question No. 4, and question No. 16 on reverse side, under caption "Duties"). *Page 588 
(2) The application shows that the decedent did not drink (Exhibit C-2, question No. 12, Part "B"); while the O'Hanlon report discloses that he did drink (Exhibit D-1, question No. 13, and reverse side).
(3) The O'Hanlon report further discloses that investigation was made of the decedent's past medical history (Exhibit D-1;
reverse side, under caption "Health").
The proofs show that Dr. Benjamin N. Schenker who had treated the decedent in April of 1941, said his "provisional diagnosis" had disclosed "delirium tremens." The doctor was located "around the corner" from the decedent at 246 Fifth Street, Jersey City (testimony, page 17), the decedent having lived at 606 Jersey Avenue, Jersey City (testimony, page 63).
It also appears from the O'Hanlon report that on or about May 21st, 1938, the decedent obtained a $1,000 insurance policy. Question No. 15-c of the report (Exhibit D-1) reads: "Do you regard applicant as a desirable life insurance risk?" And the report answers, "YES-remarks."
The complainant, under the bill filed herein, is required to show (1) false representations of fact; (2) reliance upon the false representations; and (3) that the false representations were material.
In the case of United Life and Accident Insurance Co. v.Winnick, 113 N.J. Eq. 288; 166 Atl. Rep. 515, Vice-Chancellor Backes said:
"The false representation, if material and relied upon to the complainant's injury, presents the plainest kind of a case for relief in equity as well as at law."
And in the same case, in approving the dismissal of the bill of complaint in the case of Metropolitan Life Insurance Co. v.Sussman, 109 N.J. Eq. 582; 158 Atl. Rep. 406, the Vice-Chancellor said:
"* * * it appeared, however, that the insurance company had notice of the other insurance, and, consequently, had not relied on the written misrepresentation."
However, the testimony herein indicates that the complainant relied upon its own investigation as shown in the O'Hanlon report, rather than upon the decedent's application *Page 589 
(testimony, page 54). The O'Hanlon report is referred to by complainant's witness, Miss Hird, as the "so-called credit report" (testimony, page 53). Miss Hird is employed in complainant's underwriting department and has been in its employ for forty-one years. She acted in conjunction with complainant's witness, a Mr. Wilmot, employed in its medical department (testimony, page 53), who approved the medical part of the decedent's application on December 11th, 1941, and then forwarded it to Miss Hird in the underwriting department for final approval. She had the decisive word of approval or rejection of the application. She, in effect, admitted that her decision would be determined by the contents of the O'Hanlon report (testimony, page 61).
The law governing independent investigations is not new in our system of judicature. It is well established and maintains a strong influence in the determination of questions involving its principles. Where one undertakes to make an independent investigation, and acts upon it, he is presumed to have been guided by it and is bound accordingly. The decisions of the courts on the merits of independent investigations are numerous and the text writers devote considerable space to the important part they play in litigation.
"One cannot secure redress for fraud where he acted in reliance upon his own knowledge or judgment based upon independent investigation. This rule is especially applicable where the representee's investigation was undertaken at the suggestion of the representor. If it is established that the representee relied upon his own judgment and not upon the representor's statements, he cannot recover, even though he was genuinely deceived by the representations and his investigation was of an incomplete character. Obviously there can be no recovery if the investigation revealed the true facts so that if the representee was deceived at all he in effect deceived himself. Where the representee undertakes an independent investigation he is ordinarily chargeable with knowledge of all the facts which such an investigation should disclose, and has no right to rely upon the representor's statements." 26 Corp. Jur. 1162, 1163 § 75.
Vice-Chancellor Van Fleet aptly stated the rule in the case ofParker v. Hayes, 39 N.J. Eq. 469, when he said:
"A false representation made to a person who knows it to be false is not, in legal estimation, a fraud. True, it is a *Page 590 
falsehood, and perhaps, judged according to moral standards, it is none the less sinful because spoken to a person who cannot be deluded by it, but a false representation, to be the proper subject of judicial action or cognizance, must be cause of legal wrong or injury, and no such result can follow where the representation is made to a person who knows it to be false, for in such case he cannot be deceived by it, and if he acts on it, his act will not be the result of deception, but of his own folly."
The basis for success in suits involving misrepresentation is that the suitor must have relied upon the misrepresentations. If there is no reliance, then there can be no injury upon which relief can be predicated.
The testimony herein is that before the application for insurance had been approved, the O'Hanlon report had been ordered, received and approved by the complainant (testimony, page 54). No attempt seems to have been made to counteract this testimony.
In 3 Pom. Eq. Jur. (5th ed.) 501, 502, 503, 504, 505 §890, it is stated:
"Another element of a fraudulent misrepresentation, without which there can be no remedy, legal or equitable, is, that it must be relied upon by the party to whom it is made, and must be an immediate cause of his conduct which alters his legal relations. Unless an untrue statement is believed and acted upon, it can occasion no legal injury. It is essential, therefore, that the party addressed should trust the representation, and be so thoroughly induced by it that, judging from the ordinary experience of mankind, in the absence of it he would not, in all reasonable probability, have entered into the contract or other transaction. It is not necessary that the false representation should be the sole inducement; others may concur with it in influencing the party. Where several representations have been made, and one of them is false, the court has no means of determining, as was well said by Lord Cranworth, that this very one did not turn the scale. The misrepresentation must, however, be concerning something really material. Statements, although false, respecting matters utterly trifling, which cannot affect the value or character of the subject-matter, so that if the truth had been known the party would not probably have altered his conduct, are not an occasion for the interposition of equity."
And in the same volume, section 893 (at pp. 512, 513, 514), it is stated that: *Page 591 
 "If, after a representation of fact, however positive, theparty to whom it was made institutes an inquiry for himself, hasrecourse to the proper means of obtaining information, andactually learns the real facts, he cannot claim to have reliedupon the misrepresentation and to have been misled by it. Such claims would simply be untrue. The same result must plainly follow when, after the representation, the party receiving it has given to him a sufficient opportunity of examining into the real facts, when his attention is directed to the sources of information, and he commences, or purports or professes to commence, an investigation. The plainest motives of expediencyand of justice require that he should be charged with all theknowledge which he might have obtained had he pursued the inquiryto the end with diligence and completeness. He cannot claim thathe did not learn the truth, and that he was misled." (Italics mine.)
And in the same volume, section 895, page 521, the following appears:
"It must be shown that the party proceeded, in some measure, to avail himself of the opportunity — that he took some steps in making an independent investigation — so that, although his examination might not have been complete and successful, yet he must be charged with the knowledge he would have acquired by means of a thorough investigation. In other words, it must appear that, through the opportunity and means of inquiry, he received some information concerning the actual facts, so that, from consideration of expediency, he should not be allowed to allege his failure to obtain all the knowledge which he might have acquired."
See Berger v. Harrison Improvement Co., 108 N.J. Eq. 558;155 Atl. Rep. 792, wherein Vice-Chancellor Berry, among other things, said:
"Such investigation by the vendee is considered as proof that he did not rely upon the vendor's representations, but upon his own inquiry instead; and if that inquiry was negligently made, or not pursued to a proper conclusion, he cannot take advantage of his own neglect. The rule is designed to prevent fraud, and is born of the practical impossibility of learning the extent of the knowledge obtained by such an investigation."
In the case of Condon v. Sandhowe, 97 N.J. Eq. 204;127 Atl. Rep. 101, Vice-Chancellor Bentley had the following to say:
"I think there can be no question that the defendants would have been entitled to rely upon any such statement as that *Page 592 
with which they charge the complainants. The trouble is, however, as I have said, that they did not do so, but preferred to investigate the matter for themselves, and having done so, must be charged with what it is reasonable to assume they found, or could have found, if their investigation was made with care and completeness to be expected of one who deals at arm's length with another."
The principle enunciated in the foregoing citations is also expressed in the case of Mount v. Loizeaux, 86 N.J. Law 511;92 Atl. Rep. 593.
In a suit for rescission the complainant is required to act promptly upon its discovery of fraud or misrepresentation. It does not appear in the instant situation that the complainant acted with the promptness which the law demands. In this proceeding two years and ten months elapsed from the time complainant received the O'Hanlon report before it filed its bill. It permitted one year and ten months to elapse without electing to rescind, from the date it received the O'Hanlon report to the date of decedent's death. It also permitted over a year to elapse from October 4th, 1943, the date it received proofs of decedent's death (Exhibit C-7), before it filed its present bill. It permitted nine months to elapse from the date of the physician's statement (Exhibit C-4) before it instituted this suit.
The O'Hanlon report disclosed facts which were at variance with those in the application; it, therefore, became incumbent upon the complainant to make an election. It failed to elect. It should now have no cause to complain.
In Dennis v. Jones, 44 N.J. Eq. 513; 14 Atl. Rep. 913,
Chancellor McGill said:
"It is the rule that the defrauded party to a contract has but one election to rescind, that he must exercise that election with reasonable promptitude after discovery of the fraud, and that when he once elects he must abide by his decision."
See, also, Faulkner v. Wassmer, 77 N.J. Eq. 537;77 Atl. Rep. 341. The rule in the Faulkner Case was later followed in the case of Kazepis v. North Jersey Holding Co., 111 N.J. Eq. 342; 162 Atl. Rep. 595, wherein the court cited the case ofBerger v. Harrison Improvement Co., supra, with approval. *Page 593 
Complainant is bound to act in good faith and if it led the decedent to believe that his policy was valid, it should not upon the occurrence of a loss, declare it to be forfeited.
If the policy is to be taken as issued, on January 22d 1942, as testified to by Miss Hird (testimony, page 52), which was over one month after the receipt by complainant of said O'Hanlon report, then complainant elected to accept the risk, with knowledge of the evidence of forfeiture, namely, the O'Hanlon report; and it, therefore, is estopped to declare a forfeiture at this time.
Chancellor McGill, speaking further for the Court of Errors and Appeals, in the case of Dennis v. Jones, supra, stated the following:
"It is unnecessary for us to determine whether the proofs establish the fraud; for it is apparent that if there was in fact the fraud complained of, it, in substance, became manifest to the appellants months before the foreclosure suit was commenced. When it was discovered, it was the appellant's duty, with all reasonable diligence, to disaffirm the contract. They could not derive all possible benefit from the transaction, and then be relieved from their obligation by a rescission, or refusal to perform, on their part. It would be most inequitable to permit them to hold the rink and its business, in apparent acquiescence in the fraud, until the collapse of the business was assured, and then rescind their contract. * * *
"Their election thus made was irrevocable."
In DeWitt v. Van Sickle, 29 N.J. Eq. 209, Vice-Chancellor Van Fleet (at p. 215), said:
"A person who willfully closes his eyes to avoid seeing what he believes he would see if he kept them open, must be considered to have seen what any man with his eyes open would have seen."
 In Norfolk and New Brunswick Hosiery Co. v. Arnold, 49 N.J. Eq. 390; 23 Atl. Rep. 514, Vice-Chancellor Van Fleet said:
"If the complainant found that it had been deceived, and desired to rescind the contract for that reason, it was bound to act promptly on the discovery of the fraud. The law will *Page 594 
not tolerate delay in such cases. The defrauded party cannot speculate on the chances and wait until he can see whether it will be most to his advantage to rescind or abide by the contract. * * *
"Equity can only help the diligent. The principle laid down by Lord Camden, more than a century ago, is still the guide of the court in cases where the party seeking its aid has been guilty of great delay. He said: `A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands where the party has slept upon his rights or acquiesced for a great length of time. Nothing can call forth this court into activity, but conscience, good faith and reasonable diligence. Where these are wanting, the court is passive and does nothing; laches and neglect are always discountenanced.' Smith v. Clay, 3 Brown Ch. 639, note."
In Berger v. Harrison Improvement Co., supra, the court determined that a delay of five months barred relief. InFaulkner v. Wassmer, supra, a delay of four months barred relief; and in Snyder v. Czerminski, 108 N.J. Eq. 113;154 Atl. Rep. 199, a delay of eight months barred relief.
It is my opinion that the bill should be dismissed, and that the relief sought by the defendant's counter-claim herein should be granted. I shall advise a decree to this effect. *Page 595