189 N.J. Super. 89 (1981)
458 A.2d 1311
JOSEPH BERMAN AND PHYLLIS H. BERMAN, HIS WIFE, ALBERT REISMAN AND REVA REISMAN, HIS WIFE, JACOB HOLTZ AND ANNA HOLTZ, HIS WIFE, SAMUEL P. ROBINSON AND LILLIAN ROBINSON, HIS WIFE, BENJAMIN LEBED AND PEPE LEBED, HIS WIFE, M. MILTON SINGER AND SARA W. SINGER, HIS WIFE, PLAINTIFFS,
v.
MAX GURWICZ, EDWARD GURWICZ, A/K/A HERZEL GURWICZ, REGENCY TOWERS, A NEW JERSEY CORPORATION, VENTNOR MANAGEMENT COMPANY, A NEW JERSEY CORPORATION, REGENCY TOWERS CONDOMINIUM ASSOCIATION, A NEW JERSEY NONPROFIT CORPORATION, REGENCY TOWERS CONDOMINIUM, A CONDOMINIUM ESTABLISHED IN ACCORDANCE WITH THE PROVISIONS OF R.S. 46:8-B-1 TO 30, PROVIDENT NATIONAL BANK, A NATIONAL BANKING CORPORATION, AND CITY OF VENTNOR, A MUNICIPAL CORPORATION, JOINTLY, SEVERALLY AND IN THE ALTERNATIVE, DEFENDANTS.
Superior Court of New Jersey, Chancery Division Atlantic County.
Decided August 21, 1981.
*92 William W. Shultz for plaintiffs (Alten, Valentine, Seltzer & Shultz, attorneys).
Leonard C. Horn for defendants (Horn, Goldberg & Gorny, attorneys).
Joseph Berman and Phyllis H. Berman, pro se.
HAINES, J.S.C.
The Regency Towers is a large condominium situated at 5200 Boardwalk in Ventnor, New Jersey. The individual plaintiffs purchased condominium units at the Regency; some executed their purchase agreements prior to construction, others afterward. The Regency Towers Condominium Association is a plaintiff composed of all owners of units at the Regency. These units are subject to a lease entitled "Recreation and Health Unit Agreement," entered into between the Regency Towers, as landlord, and the Regency Towers Condominium Association, as tenant. The lease was executed and recorded prior to the sale of any units and therefore at a time when the tenant association was controlled by the landlord-owner. It runs for a term of 90 years and covers a recreation area, including a swimming pool, which is a part of the building complex. The initial annual rent is $30,000, increasing gradually to $48,000 in the seventh year and then remaining at that figure. This rent is collected from the unit owners by the Association in addition to a monthly maintenance fee, and paid to the landlord.
Plaintiffs seek damages and cancellation of the recreation lease; they advance several theories in support of their claims.

A. The Defendants' Nondisclosure
The initial theory advanced by plaintiffs is based upon a claim of fraud, consisting of actual misrepresentation or concealment.
Legal fraud or misrepresentation consists of a material misrepresentation of a presently existing or past fact, made with knowledge of its falsity, with the intention that the other party rely thereon, and that he does so rely to his damage. [Citations omitted.] In equitable fraud, the second element (knowledge) *93 is not necessary, but the other four are essential. [Foont-Freedenfeld v. Electro-Protective, 126 N.J. Super. 254, 257 (App.Div. 1973), aff'd 64 N.J. 197 (1974)]
Partial disclosure may amount to fraud. The rule is found in Pomeroy, Equity Jurisprudence, (5 ed. 1941), § 901a:
If in addition to the party's silence there is any statement, even any word or act on his own part, which tends affirmatively to a suppression of the truth, to a covering up or disguising the truth, or to a withdrawal or distraction of the other party's attention or observation from the real facts, then the line is overstepped, and the concealment becomes fraudulent The maxim, is Aliud est celare, aliud tacere. Although a party may keep absolute silence and violate no rule of law or equity, yet if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to discover the whole truth. A partial statement then becomes a fraudulent concealment, and even amounts to a false and fraudulent misrepresentation. [at 548-549; footnotes omitted]
Silence, in the face of a duty to disclose, may be a fraudulent concealment. The relationship of the parties may create that duty. The parties here were the buyers and the seller of real property. Caveat emptor, the early rule, no longer prevails in New Jersey. The modern rule is set forth in Weintraub v. Krobatsch, 64 N.J. 445 (1974):
Our courts have come a long way since the days when the judicial emphasis was on formal rules and ancient precedents rather than on modern concepts of justice and fair dealing. While admittedly our law has progressed more slowly in the real property field than in other fields, there have been notable stirrings even there. See Schipper v. Levitt & Sons, Inc., 44 N.J. 70 (1965); Reste Realty Corporation v. Cooper, 53 N.J. 444 (1969); cf. Marini v. Ireland, 56 N.J. 130 (1960); Totten v. Gruzen, et al, 52 N.J. 202 (1968). In Schipper we elevated the duties of the builder-vendor in the sale of its homes and in the course of our opinion we repeatedly stressed that our law should be based on current notions of what is "right and just." 44 N.J. at 90 [64 N.J. at 455]
There are three classes of transactions described in Pomeroy, op. cit., § 902, in which a duty to disclose arises. The first class includes definite fiduciary relationships, such as principal and agent, client and attorney; none of which is involved here. The other two classes are described by Pomeroy:
The second class embraces those instances in which there is no existing special fiduciary relation between the parties, and the transaction is not in its essential nature fiduciary, but it appears that either one or each of the parties, in entering into the contract or other transaction, expressly reposes a trust and confidence in the other; or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the *94 particular case is necessarily implied. The nature of the transaction is not the test in this class. Each case must depend on its own circumstances. The trust and confidence, and the consequent duty to disclose, may expressly appear by the very language of the parties, or they may be necessarily implied from their acts and other circumstances. [Footnote omitted]
The third class includes those instances where there is no existing fiduciary relation between the parties, and no special confidence reposed is expressed by their words or implied from their acts, but the very contract or other transaction itself, in its essential nature, is intrinsically fiduciary, and necessarily calls for perfect good faith and full disclosure, without regard to any particular intention of the parties. The contract of insurance is a familiar example. [§ 902 at 552-554]
The significance of the disclosure requirement is underlined by Pomeroy: "If either party to a transaction conceals some fact which is material, which is within his own knowledge, and which it is his duty to disclose, he is guilty of actual fraud." Op. cit., § 901 at 545-546. The rule is set forth in Jewish Center of Sussex County v. Whale, 165 N.J. Super. 84 (Ch.Div. 1978), aff'd 172 N.J. Super. 165 (App.Div. 1980):
The fact that no affirmative misrepresentation of a material fact has been made does not bar relief. The suppression of truth, the withholding of the truth when it should be disclosed, is equivalent to the expression of falsehood. The question under those circumstances is whether the failure to volunteer disclosure of certain facts amounts to fraudulent concealment, or, more specifically, whether the defendant is bound in conscience and duty to recognize that the facts so concealed are significant and material and are facts in respect to which he cannot innocently be silent. Where the circumstances warrant the conclusion that he is so bound and has such a duty, equity will provide relief. [at 89; citations omitted]
See, also, Nicholson v. Janeway, 16 N.J. Eq. 285, 287 (Ch. 1863).
In this State the seller of real property is subject to disclosure requirements. In Tobin v. Paparone Constr. Co., 137 N.J. Super. 518 (Law Div. 1975), a seller of residential property was held liable for failing to disclose the fact that tennis courts, already planned, would be constructed so near the dwelling that they would constitute an annoyance. The court said:
Tobin properly relied on Paparone's representation as to the character of the surrounding neighborhood. Paparone's silence created a mistaken impression on the part of the purchaser which operated to induce the purchaser to buy. This silence was a fraudulent representation and a failure to an implicit condition of sale [at 526]
*95 In Weintraub v. Krobatsch, supra, the Supreme Court held that the seller of a residence had an obligation to disclose to the buyers the existence of insect infestation, if that infestation was known. The court [64 N.J. at 449] quoted from Keen v. James, 39 N.J. Eq. 527, 540 (E. & A. 1885), in which it was stated that "silence may be fraudulent and that relief may be granted to one contractual party where the other suppresses facts which he, under the circumstances is bound in conscience and duty to disclose to the other party and in respect to which he cannot, innocently, be silent." In McDonald v. Mianecki, 79 N.J. 275 (1979), the Supreme Court provided buyers of dwellings with an implied warranty of habitability. In doing so, it noted that
... the two parties involved in this important transaction [the sale of a dwelling] generally do not bargain as equals. The average buyer lacks the skill and expertise necessary to make an adequate inspection ... the purchaser ... ordinarily relies heavily upon the greater expertise of the vendors to insure a suitable product ... aside from superior knowledge, the builder-vendor is also in a better position to prevent the occurrence of major problems ... It is not in expertise alone that the builder-vendor is generally superior. In the vast majority of cases, the vendor also enjoys superior bargaining position. [at 288-289]
It is clear from the cited authorities that defendants had a duty to disclose to the buyers those matters which materially and adversely affected the latter when they agreed to purchase condominium units at the Regency Towers. The existence of the recreation lease, which imposed substantial financial burdens upon buyers, was material and adverse. Its existence was not apparent from an inspection of the property. On the contrary, the illustration of the recreation area in the seller's brochure and its physical existence as part of the condominium complex led buyers to believe that it was a part of the common elements which involved no charge except a monthly maintenance fee. Defendants point to the fact that while they did not provide plaintiffs with a copy of the recreation lease or any other condominium documents at the time they executed their agreements of sale, they did provide them with these documents at or prior to settlement. Further, all of these documents were recorded in the Atlantic County Clerk's Office prior to settlement. *96 Consequently, they claim that there was disclosure. These contentions were addressed in the prior opinion of this court, Berman v. Gurwicz, 178 N.J. Super. 611 (Ch.Div. 1980). The pertinent holdings were:
Plaintiffs failed to read the contract documents. As a general rule, one who does not choose to read a contract before signing it cannot later relieve himself of its burdens. However, this rule does not apply when the execution of the contract has been induced by fraud, even though the fraud may have been discovered by reading the document. Nor does it apply when one party has induced the other not to read the contract in full. Furthermore, where one party to an oral agreement entrusts another with the obligation of reducing that agreement to writing, he has a right to assume that it will be drawn in accordance with the oral understanding between them. When the contrary is true, failure to read the agreement is no defense. [at 617, 618; citations omitted]
........
... Why should buyers who choose to rely upon representations of their sellers, be bound by contradictory statements of those same sellers, revealed only in recorded documents? Purchasers in the position of the plaintiffs should be able to assume, not only that the agreement presented by their seller will reflect the verbal representations which induced them to sign the agreement, but also to assume that they will not be burdened with obligations contrary to these promises through constructive notice normally imposed upon purchasers by our recording statutes. The proper rule is set forth in Restatement, Torts 2d, § 540 (1977):
"The recipient of a fraudulent representation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." [at 621]
N.J.S.A. 46:8B-15(d) adds further definition to the duty of the seller to disclose the existence and terms of the recreation lease. It authorizes condominium associations to lease recreational facilities and provides that the "fees, costs and expenses of acquiring, maintaining, operating, repairing and replacing ... such ... facilities" may be common expenses if "they are fully described in the Master Deed or bylaws." (Emphasis added). The Regency Towers documents did not comply with these requirements.
The disclosure requirement also arises from circumstances involving control of defendant Association. Governors Grove Condominium Ass'n, Inc. v. Hill Development Corp., 36 Conn. *97 Sup. 144, 414 A.2d 1177 (Super.Ct. 1980), discusses the problem. In that case the court considered allegations against a developer and a contractor who were alleged to have concealed defective roofs in a condominium development until after the units had been sold. The developer controlled the condominium association's board of directors. The court held:
The power to control the board of directors created a fiduciary relationship between Hill [the developer] and the association which mandated disclosure so that the association could take action to protect itself and the unit owners...
........
... Although there do not appear to be any Connecticut cases specifically on point, it is a well established rule of law that a dominant or majority shareholder bears the same fiduciary duty to the corporation and its minority shareholders as does a director. The relationship described here between Hill and the association is directly analogous to that between a majority shareholder and his corporation just as a majority shareholder is a fiduciary for his corporation so was Hill, by virtue of its power to control the association's board of directors, a fiduciary for the association, nor does it matter that Hill's dominant position arises from its power to select directors based on the number of condominium units sold rather than on a percentage of stock ownership. "[T]he doctine by which the holders of a majority of the stock of a corporation who dominate its affairs are held to act as trustee for the minority does not rest upon such technical distinctions. It is the fact that control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation." Southern Pacific Co. v. Bogert, 250 U.S. 483, 492 [39 S.Ct. 533, 537, 63 L.Ed. 1099] (1919). [at 1183-1184]
In the usual corporate arrangement the directors of a corporation have a fiduciary obligation to shareholders or members. Judson v. Peoples Bank and Trust Co., 25 N.J. 17, 28 (1957); Berkowitz v. Power Mate Corp., 135 N.J. Super. 36, 45 (Ch.Div. 1975). In the case of the Regency, defendants remained as directors of the Association after plaintiffs and others acquired their units.
In a condominium setting the developer who controls the association at the beginning of the selling period knows that the purchasers of the condominium units will control the association eventually; the association is designed to be the representative of all unit owners for whom it will manage the common property elements and from whom it will collect revenues with which to meet common expenses. These future owners cannot be *98 subjected to obligations undertaken by the association on their behalf without disclosure to them. Further, when disclosure has not been made to the unit owners, the association should not be saddled with unusual or unexpected liabilities until it is controlled by the unit owners and has had an opportunity to act independently with respect to them.
From the time plaintiffs executed their agreements of sale to the time they took title, complete control of the Association (the lessee) was in the defendants. This suit was commenced on August 14, 1975. Defendants did not relinquish control of the Association to the purchasers of the condominium units until October 16, 1977. At that time the minute book of the Association was delivered to those owners. It revealed the fact that the first meeting of the Association was held on April 29, 1976, long after the lease was executed and this suit commenced. No minute appears authorizing or ratifying the execution of the lease. The existence of the lease was not disclosed in any other Association record.

(1) Disclosure to Individual Purchasers Not Represented by Counsel

It is obvious that disclosure of the lease should have been made to unit purchasers before their agreements of sale were executed. The appropriate vehicles for disclosure were the agreements of sale themselves. Unfortunately, they came much closer to being documents of concealment than ones of disclosure. They provided that the buyers' rights were "fully and completely subordinate and under and subject to all construction loans, mortgages and related liens heretofore or hereafter made in connection with development of the project by seller ... without execution of any further legal documents by buyer." Marketable title was to be conveyed subject to these provisions. They also stated that: "Buyer subscribes to the Master Deed and Association By-Laws which are incorporated herein by reference and copies of which will be furnished to Buyer prior to settlement." By signing the purchase agreements the buyers *99 consented to amendments, not only to the agreements, but also to the master deed, by-laws and other condominium documents, and appointed the seller an attorney-in-fact for the purpose of executing writings which would effectuate such amendments. No specific reference to a recreation lease or a rent obligation is to be found in any sales agreement, although the quoted language was sufficiently broad to permit the subordination of the purchasers' interests in their units to such a lease, regardless of its terms.
Since the agreements of sale were so completely inadequate as instruments of disclosure, defendants were obliged to make the facts concerning the lease known to the purchasers by other means. The delivery of the condominium documents to plaintiffs at or before settlement was not enough. They were not read. The recording of these documents did not provide notice. These conclusions were reached in the earlier opinion in this matter and they have not been changed by the evidence produced at trial. Defendants claim that specific references to the lease were made in various conversations with the purchasers, before the agreements of sale were executed and at settlement. Further, they insist that the condominium documents, which include the lease, were discussed with plaintiffs at or before settlement and in detail.
Plaintiffs claim that no adequate discovery was made. Further, they testified to numerous express misrepresentations, namely, that
(a) They would own 1/99 of the entire condominium property, which contained 99 units.
(b) The cost of the recreation area was included in the monthly maintenance fee.
(c) They were given a brochure containing a picture of the completed condominium complex. It showed a swimming pool as a part of the structure and contained no information indicating that the recreation area was separately owned and leased to the Association.
(d) At settlement, each purchaser received a statement which provided financial details concerning the purchase. These sheets contained figures reflecting the monthly expenses to which the purchasers would be subject; they were not broken down to show any allocation of rent for the recreation area.

*100 (e) The so-called "blue book" which contained the condominium documents, namely, the form of purchase contract, the master deed, bylaws of the Regency Towers Condominium Association, the recreation and health unit agreement (the lease) and the management agreement, a collection of documents totaling 58 pages was handed to them at settlement or shortly before settlement. The contents of these documents were not discussed with them at settlement and were brushed aside as containing "regulations" or other routine information.
All of these misrepresentations were not claimed to have been made by every plaintiff; each said that one or more of them was made. The common thread running through all of their testimony is that they were given to understand, through direct representation, that the recreation area was a part of the common areas so that any expenses attributed to the recreation area would be paid as part of the monthly maintenance fee and not as an extra charge by way of rent.
Memory is a frail vehicle. The incidents with which this suit is concerned occurred more than seven years ago. Defendants' witnesses were unable to recall particulars with respect to any individual transaction. Instead, they relied upon their recollection that they had made careful disclosure of all details of each purchase as a matter of routine, from which they concluded that plaintiffs had been told about the lease of the recreation area. Plaintiffs, of necessity, testified about the particular transaction in which each was involved. Every plaintiff was positive not only that no explanation of the lease had been provided at settlement or otherwise, but, in addition, that one or more of the listed misrepresentations had been made concerning his or her purchase. The particularized testimony of each plaintiff is much more convincing than the general testimony of defendants and their witnesses. The latter relied primarily upon their recollection of routine procedures and reasoned that they must have discussed the lease with plaintiffs rather than recalling that such discussions in fact took place with particular persons. In a few cases they recalled specific disclosures. However, I am convinced from my observation of the witnesses and their demeanor that the nature of the rent obligation was not brought *101 home to plaintiffs in any way which satisfied the disclosure obligation of the defendants.
This conviction is buttressed by defendants' use of an agreement of sale which, as described above, not only failed to apprise the purchasers of the recreation lease but, in fact, concealed its existence. Disclosure should have been made in that agreement. It was the document upon which the purchasers relied and to which they were bound when they made settlement. The condominium documents supplied, generally, close to the settlement date, were long and complex. They were poor disclosure vehicles. Consequently, a heavy burden was placed upon the seller to advise the purchasers in clear language that they were assuming a lease obligation which would require payments of rent for 90 years when they completed their purchase. This was not done. It would have been a simple matter, for example, to show the rent obligation as a separate figure on the settlement sheet. Instead it was hidden  shown only as a part of the monthly maintenance fee. I conclude that plaintiffs, except Joseph Berman, by clear and convincing evidence, proved a failure by defendants to disclose the existence of the recreation lease and its effect, and, in addition, proved by the same standard that defendants made material misrepresentations of existing facts upon which plaintiffs, except those with counsel, relied to their damage.
The one exception to these conclusions favoring the plaintiffs is Joseph Berman. His negotiations and settlement were remembered vividly by defense witnesses because he was so meticulous and demanding in his quest for information about his purchase. His settlement took so long that future lengthy settlements were called, privately, "Berman settlements." Defendants were sure that the lease had been discussed with him. Berman, however, was equally positive in stating that he did not know of the lease until he had his first opportunity to read the condominium documents, after the settlement. I find the Berman testimony more convincing than that of the defense. He recalled many details and was an impressive witness; those who *102 differed with him remembered more general events than specific ones. Under Minter v. Bendix Aviation Corp., 26 N.J. Super. 268, 274 (App.Div. 1953), however, fraud must be proved by clear and convincing evidence. That standard is appropriate in a chancery court when dealing with a charge as significant as fraud; the preponderance of evidence test laid down in Armel v. Crewick, 71 N.J. Super. 213 (App.Div. 1961), will not be followed. I find that Berman has succeeded in proving fraud, as to him, by a preponderance of the evidence but not by clear and convincing evidence. Consequently, his claim of fraud must be dismissed.

(2) Disclosure to Plaintiffs Represented by Counsel

Plaintiffs Gold, Levine, Reisman, Haas and Block were represented by counsel either before or after they executed their sales agreements. Those agreements were examined, or should have been examined, by their attorneys. The agreements were so worded as to permit the subjection of the condominium units to the lease in question. No objection to this language was made by these plaintiffs themselves or through their attorneys. At the time of settlement the lease was a matter of record and available for examination. The blue book containing the lease was also available for examination. It was the obligation of these attorneys to make these examinations and to advise their clients of the lease. The client relied upon them to do so; they were employed for that purpose. It was the obligation of these attorneys to advise their clients of all "observable defects, deficiencies and imperfections of the title". Toth v. Vasquez, 3 N.J. Super., 379, 384 (Ch.Div. 1949)
Under the circumstances, it cannot be said that these plaintiffs relied upon any misrepresentations or concealments of the defendants respecting the lease; they relied upon counsel and therefore cannot recover on a theory of fraud. This conclusion is supported by Savings Bank Retirem. System v. Clarke, 258 Md. 501, 265 A.2d 921 (Ct.App. 1970). In that case the Maryland court held that plaintiffs, who were represented by counsel in connection with a real estate transaction, relied upon counsel *103 and not upon representations of defendant. Recovery was denied because an essential element of the fraud claim was missing: reliance.
Plaintiffs who were represented by counsel either made or should have made an independent investigation of the facts through their attorneys. That was the purpose of employing counsel. The exercise of reasonable diligence by these attorneys required them to make appropriate inquiries which would have disclosed all of the lease details. Had these been known to plaintiffs, they could not now claim reliance. Under the reasonable diligence rule they must be treated as though the details were known. Consequently, they have not proved reliance. The rule is set forth in John Hancock Mut. Life Ins. Co. v. Cronin, 137 N.J. Eq. 586, aff'd 139 N.J. Eq. 392 (E. & A. 1946):
[There may be no recovery where] investigation discloses facts sufficient to expose the falsity of the representations ... or which are of such a nature as to place upon the ... [plaintiff] the duty of further inquiry.
........
[The extent of plaintiffs' reliance is to be measured by the] knowledge gained or which could have been gained by the exercise of reasonable diligence.
........
One cannot secure redress for fraud where he acted in reliance upon his own knowledge or judgment based upon independent investigation ... if it is established that the representee relied upon his own judgment and not upon the representor's statements, he cannot recover, even though he was genuinely deceived by the representations and his investigation was of an incomplete character... Where the representee undertakes an independent investigation he is ordinarily chargeable with knowledge of all the facts which such an investigation should disclose and has no right to rely upon the representor's statement. [at 137 N.J. Eq. 589; quoting from 26 C.J. § 75 at 1162, 1163]

B. Fraud as to the Association
At the time this suit was commenced the Regency Towers Condominium Association was named as a defendant because it was still under the control of defendants. Prior to trial, since control of the Association had shifted to the unit owners, its position was changed, on the record, to that of a plaintiff. It claims the lease of the recreation area should be set aside by reason of fraud.
*104 Defendants controlled the Association until after the lease had been executed. They remained in control for more than two years after this suit was commenced. No disclosure of the lease arrangement was made in any Association record and it was not provided with any opportunity, independent of defendants, to accept or reject the lease obligation. This was concealment constituting fraud when practiced by a fiduciary upon those to whom that fiduciary had an obligation of disclosure. Defendants were fiduciaries by reason of their control of the Association. That control does not appear to have been relinquished until all or nearly all of the condominium units were sold, since the gradual election of unit owners to the Association's governing body, required by N.J.S.A. 46:8B-12.1, was not undertaken.
Plaintiffs therefore carried the burden of proving fraud upon the Association by clear and convincing evidence. The evidence in this respect was not contradicted. It could be overcome only if defendants, who had the burden, proved that disclosure of the lease agreement had been made to the unit purchasers. Disclosure to the Association in time to permit it to act with discretion was required only for the purpose of providing it with an opportunity to protect the unit owners, present and future. Satisfactory proof of that disclosure was not provided. Only a handful of the 99 unit owners testified. For the reasons stated above, I conclude that adequate disclosure was not made except in the case of those plaintiffs who were represented by counsel and in the case of Joseph Berman whose proof was insufficient. The Association is therefore entitled to relief, only, however, on behalf of those unit owners who were not parties to this proceeding and those plaintiffs who were not represented by counsel; Joseph Berman's unit is excluded with respect to this relief.

C. The Execution of the Lease
The recreation lease was executed by the Regency Towers Condominium Association, a nonprofit corporation, at a *105 time when that corporation had not, in fact, come into existence. The lease document was signed on August 16, 1974. The Association's certificate of incorporation was executed on August 19, 1974 and filed in the Secretary of State's office on September 4, 1974. The bylaws, which contain express authority for entering into the recreation lease, were also adopted before the Association became a legal entity: they were made effective on August 1, 1974. The minutes of the Association do not reflect the adoption of any resolution or the taking of any other action authorizing or ratifying the execution of the lease. Therefore, the lease was a pre-incorporation agreement which the Association was free to adopt or reject at its discretion. H. Horowitz Inc. v. Weehawken Trust & Title Co., 10 N.J. Misc. 417, 421, 159 A. 384, 386 (Sup.Ct. 1932); K & J Klayton Holding Corp. v. Keuffel & Esser Co., 113 N.J. Super. 50, 53 (Ch. 1971); Waat Program Service v. Carroll, 136 N.J.L. 574, 576, 57 A.2d 4, (E. & A. 1947). The adoption of a pre-incorporation agreement may be evidenced by action of the corporation after it is formed; it need not be accomplished by a formal resolution of the board of directors. In K & J Klayton Holding Corp., supra, for example, the commencement of a suit for specific performance by the corporation named as purchaser in a pre-incorporation agreement was held to constitute an adoption of the agreement by the corporation, giving it the right to enforce performance.
In the present case the lease was executed in 1974, at which time defendants controlled the Association  control which continued until October 16, 1977. The first meeting of the Association was held on April 29, 1976. Any adoption or ratification of the lease after suit was commenced would achieve doubtful validity. At that time defendants who were the directors of the Association had a fiduciary obligation to the owner-members of the Association. Judson v. Peoples Bank & Trust Co. and Berkowitz v. Power/Mate Corp., both supra. Consequently, their adoption of the lease in the face of litigation attempting to set it aside would not be in the interest of the owner-members and would be a breach of the fiduciary obligation owed to them. *106 In any event, this action was not taken. Later, when the unit owners gained control of the Association, it maintained its opposition to the lease, eventually becoming a plaintiff in these proceedings. It is true that it collected rent from the unit owners as common expenses and paid them to defendants. However, these collections did not commence until October 16, 1977, after this suit had commenced and after control of the Association had passed from the hands of defendants. Technically, the Association remained a party defendant in this action until 1980, when it became instead a party plaintiff. However, this appears to have been a technical oversight; it is reasonable to conclude that the Association was, in fact, a party plaintiff from the time control shifted on October 16, 1977 to the present time. It is also apparent that its collection of rents during the pendency of this litigation challenging the validity of the lease could not in any way be construed as ratification of that lease; its position was directly to the contrary and its suit seeks the recovery of those rents.
The defense points to the fact that all purchasers, by virtue of their acceptance of title to their condominium units, expressly authorized the Association to enter into the recreation lease. Similar authority appears in the bylaws of the Association. It is argued that this authority, plus the statutory recognition of the right of the developer to control the Association during the early stages of development and to enter into agreements with the Association notwithstanding the fact that the developer in effect would be executing agreements with himself, provides sufficient proof that the Association is bound by the lease. The statute, however, does not expressly authorize the execution of leases by the developer and the Association. The argument overlooks the fact that the unit purchases bound only the individual owners to the provision of the master deed and by-laws. These individuals had no authority to bind the Association and, in fact, by accepting the language of the master deed and by-laws, merely authorized the Association to enter into the lease. The Association had no obligation, by reason of this *107 authorization, to adopt or ratify the lease. In any event, I have found that the lease obligation was imposed by fraud upon the Association and all owners except the plaintiffs who were represented by counsel (other than Berman); these authorizations cannot be effective.
It necessarily follows that the only lease which the developer executed was one which bound the developer as landlord to himself as a promoter of the Regency Towers Condominium Association. The Association did not adopt or ratify this agreement, has the right to reject it and has done so through the institution of this suit. It is not bound by the lease.

D. The Developer's Reservation of the Recreation Areas
Plaintiffs claim that the recreation areas are a part of the common elements of the condominium and therefore belong to the unit owners since 100% of all common elements were in fact divided proportionately among the owners of the 99 units. This contention requires a careful examination of the condominium documents.
For numerous reasons, the master deed is unclear and confusing in its references to the recreation areas. It requires interpretation.
(1) Section 1 of the deed establishes the condominium in accordance with N.J.S.A. 46:8B-1 to 30 (by express reference) for premises described in the deed by metes and bounds. Section 8B-3 i of the Condominium Act provides the following definition:
"The condominium property" means the land covered by the Master Deed, whether or not contiguous and all improvements thereon, all owned either in fee simple or under lease, and all easements, rights and appurtenances belonging thereto or intended for the benefit thereof.
The language of the statute would require the recreation areas to be included as part of the property described in the master deed since those areas are "improvements" and are also "rights and appurtenances," which are part of the land described in the deed.
*108 (2) Section 2A of the deed provides a general description of the building to be constructed by Regency Towers, the grantor, and states in part:
The ground floor will contain an inner lobby, an outer lobby, office, bicycle room, and other common elements and a party room which is specifically declared not to be a part of the condominium property as is graphically shown on Exhibit A, page 16, in addition to that part of the second floor shown on the Exhibit A, page 17, and the balance of the third floor, as is graphically shown on Exhibit A, page 18, are attached hereto and made a part hereof.
This creates confusion:
(a) Exhibit A (which covers several pages), page 16 of the master deed, shows an area entitled "Meeting Room" (not called "Party Room") emphasized in blue. A blue square at the bottom of the exhibit identifies the blue area as "recreation area."
(b) No second floor plan is shown as a part of Exhibit A, page 17. This is a street level rendition.
(c) Exhibit A, page 18, does show a blue area identified by a blue square at the bottom of the sketch as "Recreation Area."
(d) Exhibit A, page 19, shows an additional blue area designeated "Recreation Area," not mentioned in section 2A of the master deed.
(e) The language of section 2A is ambiguous. It may not reserve anything except the "Party Room" to the grantor. Further, it makes no reference to recreation areas and does not state that any blue areas shown in the attached exhibits are reserved to the grantor.
(3) Section 2E of the deed carefully defines the physical boundaries of each condominium unit, treating them generally. No description of this kind, or of any kind, except to the extent that the blue areas on Exhibit A are descriptions, provides any identification of the recreation areas.
(4) Section 3A of the master deed describes the common elements as "all appurtenances and facilities and other items which are not part of the units or individual appurtenances as hereinabove described with the exception of the recreation area..." This may be read as saying that the recreation area is part of the "units or individual appurtenances." By way of amplification, this section provides that the common elements shall also include:
(f) Foundation, main walls (including windows, doors and chimneys therein, roofs and floors).
........

*109 (h) All easements for the benefit of any unit and any easement or other right hereafter granted for the benefit of the unit owners for access to or use of recreational or other common elements not included within the lands which are part of the condominium.
........
(j) All other elements of the condominium rationally of common use or necessary to the existence, upkeep and safety thereof.
These descriptions include all of the physical aspects of the recreation areas, e.g., floors, walls, windows, doors, accessways and utilities. In addition, section 3A(h) indicates that recreation areas are "common elements."
(5) The blue areas shown on Exhibit A attached to the master deed in some cases include portions of the exterior walls of the building. In many cases they fail to touch the inside of the walls by a short distance, which could be measured only with doubtful accuracy. In all cases they include certain walls, doors and accessways. The blue color may be intended to include the floor of the recreation areas although this cannot be determined from the documents or drawings. It does not include at most any more than the surface of the floors; a cross section of the pool, for example, showing its depth and its bottom contours are not in blue.
(6) Section 5C of the deed provides: "The administration of the common elements of the Condominium and the recreational facilities shall be by the Association in accordance with the provisions of the Condominium Act, this Master Deed [and] the By-Laws attached hereto...." No mention is made of the recreation lease in this sentence. Later, however, the same section provides: "With respect to the Recreational Facilities, the Association is ... authorized ... to enter into a lease ... for the purpose of leasing, for the use of the Association, Recreational Facilities which have not been conveyed by the Grantor under the Master Deed." Thus, the purchaser is referred to "Facilities," not areas, and is told that the lease does not pertain to facilities which were conveyed by the master deed. That deed, as noted above, may have included the recreation *110 areas in question. The master deed is one of several so-called "Condominium documents" which are bound in a blue folder. The other documents consist of the Purchase Contract, By-laws of the Regency Tower Condominium Association, the Recreation and Health Unit Agreement (sometimes referred to as "Lease") and a Management Agreement. All documents except the purchase contract were executed at the time of settlement and must be read in pari materia. Keegan v. Keegan's Estate, 157 N.J. Super. 279, 291 (Ch.Div. 1978). Consequently, their language may assist the court in interpreting the master deed. The following are informative:
By-laws:
Article II, § 2(f)(1) empowers the association to enter into a lease with the Grantor for "recreational facilities not conveyed by the Grantor under the Master Deed ...," thus duplicating the uncertain wording of section 5C of the deed.
Article II, § 2(1) empowers the Association's Board to "build, erect, repair, maintain and renovate recreation facilities," the usual prerogative of an owner.
Recreational and Health Unit Agreement: Section B states:
The Landlord is presently the owner of the certain unit in the Condominium which, together with such units proportionate undivided interest in the Common Elements, constitutes the Recreation Unit as so designed in the Master Deed, and more particularly described in the plan attached thereto as its exhibit "D-4", showing the Lobby Level of the Building, and Third Floor Level.
No Exhibit D-4 is attached to the master deed. More important, the references to "Recreation Unit" (emphasis added) and the "units' proportionate undivided interest in the Common Elements," support plaintiffs' contention that they own the recreation areas. One hundred percent of the common elements was conveyed to the unit purchasers. In addition, they acquired all of the units in the condominium property. Consequently, if the recreation area covered by the lease was a unit or was part of the common elements, it was transferred to the unit owners.
Management Agreement: Section B of the preamble provided:
The property of the Condominium contains, among other things, Ninety-Nine (99) Residential Units and a Recreation Unit and their appurtenant interests in the "Common Elements". (The aforesaid terms and all other capitalized terms *111 used herein shall have, unless otherwise expressly stated, the same meanings ascribed to them in the aforesaid Master Deed and By-laws.)
The same comments apply here as were applied to the same language in the Recreation and Health Unit Agreement above. However, this second indication that the recreation area is a condominium unit with common elements certainly emphasizes that interpretation.
Section 2C requires the manager to maintain "those portions of the Building, appurtenances and grounds on the Property which are Common Elements or Limited Common Elements of the Condominium as well as the facilities contained in the Recreation Unit (the "Leased Recreation Facilities")...."
The assessor for the municipality in which the Regency Towers Condominium is situate, a person of long experience and broad education in the real estate and assessment field, testified concerning his assessment of that property. He had great difficulty in identifying the recreation area as a separate, assessable property interest because it was nothing but "air space"; he decided it had no common elements and would have to be treated as part of the common areas belonging to all of the unit owners. In short, its value would have to be assessed as a part of their interest in the common elements. The property was assessed accordingly for about a year and a half. He was advised by the landlord named in the recreation lease that the recreation area was a "unit" and decided to give it an arbitrary separate property designation and assessment. The amount of assessment, however, was based entirely upon the rental income from the lease; he could devise no other appropriate approach to value.
N.J.S.A. 46:8B-3 d defines "common elements," in part, as follows:
........
(ii) as to any improvement, the foundations, structural and bearing parts, supports, main walls, roofs, basements, halls, corridors, lobbies, stairways, elevators, entrances, exists and other means of access, excluding any specifically reserved or limited to a particular unit or group of units.
........

*112 (v) installations of all central services and utilities
........
(vii) all other elements of any improvement necessary or convenient to the existence, management, operation, maintenance and safety of the condominium property or normally in common use; and
(viii) such other elements and facilities as are designated in the Master Deed as common elements.
It is of some moment that the grantor did not reserve to itself any right of access to the common areas except in case of termination of the lease by reason of the tenant's default. Strictly speaking, therefore, title to the recreation area was not marketable. This is not a basis for relief here and is not relied upon by plaintiffs. A right-of-way will be implied in such circumstances, Ghen v. Piasecki, 172 N.J. Super. 35, 41 (App.Div. 1980), and the usual rule is that a tenant may not question the title of its landlord. Trenton Oil Co. v. Dries, 30 N.J. Super. 122, 129 (Law Div. 1954). Nevertheless, the failure to reserve an access way is significant when interpreting the master deed; it supports the contention that the recreation area is a part of the common elements since that arrangement would eliminate any access problem.
The condominium documents are to be interpreted favorably to plaintiffs since they were prepared by defendants. Trautwein v. Bozzo, 35 N.J. Super. 270, 282 (Ch.Div. 1955), aff'd 39 N.J. Super. 267 (App.Div. 1956). The most that can be said of the master deed in favor of the grantor is that it attempted to reserve the "party room" to itself so that it would not be part of the condominium property. It contains no reservation of any other so-called recreation area nor can such reservation be found in any other condominium document. Section 3 of the master deed does describe the common elements as everything which is not part of the condominium units except the recreation area (not described), but itself later refers to "recreational or other common elements." It is clear that the blue areas shown on Exhibit A attached to the master deed include various common elements as defined in the language of the master deed and the *113 Condominium Act. It therefore cannot be said that all of the blue areas (never reserved in any event by the grantor in the master deed or other instruments) define property reserved by the grantor; on the contrary, it is impossible to determine with any accuracy what they include, except that they include some common areas. It appears that the areas marked in blue are merely cubes of air, except where they embrace common elements such as walls, doors and passageways. The lease is more clear; it refers to the recreation area as comprising a "condominium unit which includes a proportion of undivided interest in the common elements," a proper description for a condominium unit. The management agreement is clearer still. It describes the property of the condominium as including "Ninety-Nine (99) Residential Units and a Recreation Unit and their appurtenant interests in the `Common Elements.'"
Applying the rule of construction which favors plaintiffs, it is apparent that the grantor was not successful in any attempt to reserve the recreation areas for itself. The analysis of the condominium documents overwhelmingly supports an interpretation of the master deed which includes the recreation areas as part of the common elements which were conveyed to the unit owners. As a result, there was no separate recreation unit with appurtenant common elements to be leased to the Association and the lease is of no effect. A like result was reached in Ackerman v. Spring Lake of Broward, 260 So.2d 264 (Fla.Dt.Ct. App. 1972). See, also, Souder v. Harbour Club Condominium No. 3, 346 So.2d 556 (Fla.Dt.Ct.App. 1977), in which the court held that rent must be paid for the use of a recreation area notwithstanding the transfer of its title to the unit owners, when the declaration establishing the condominium subjected the area to use by third parties for which rent was charged. The master deed in the present case did not contain similar use restrictions.
There are additional reasons supporting this conclusion:
(a) N.J.S.A. 46:8B-6 provides:

*114 The proportionate undivided interest in the common elements assigned to each unit shall be inseparable from such unit, and any conveyance, lease, devise or other disposition or mortgage or other encumbrance of any unit shall extend to and include such proportionate undivided interest in the common elements, whether or not expressly referred to in the instrument effecting the same.
The lease, by its express language, covers a recreation unit with its proportionate undivided interest in the common elements. However, the grantor reserved no common elements, conveying them 100% to the residential unit owners. Consequently, the lease does not meet the requirements of the above statute; it does not include any proportionate undivided interest in the common elements. Florida has a similar condominium statute which has been so interpreted. Daytona Develop. Corp. v. Berquist, 308 So.2d 548 (Fla.Dt.Ct.App. 1975).
(b) N.J.S.A. 46:8B-9(e), (f) and (g) require the master deed to identify each condominium unit, describe the common elements and set forth the undivided interests in the common elements which are appurtenant to each unit. The percentages must aggregate 100%. The present master deed does this, but it does not set forth any recreation area as a unit and does not attribute common elements to any recreation unit.
(c) The common elements are defined in the statute and master deed. They include "all ... elements of any improvement necessary or convenient to the existence, management, operation, maintenance and safety of the condominium property." N.J.S.A. 46:8B-3 d vii. They are also "elements of the condominium rationally in common use or necessary to the existence, upkeep and safety thereof." Master Deed, section 3A(j). At most, the grantor's recreation area consisted of several cubes of air, clearly included as common elements in the above definition.

Conclusion
A. Plaintiffs who were not represented by counsel, except Joseph Berman, were subjected to the terms of the recreation lease through fraudulent actions. As to them the lease is set *115 aside. All rents paid by them shall be returned. The total rents payable to the landlord under the lease shall be reduced by the amounts otherwise apportioned to the units owned by these plaintiffs. However, the reduction shall not include rents paid after the sale of any unit which was sold after this suit was commenced unless the purchaser is a party plaintiff. This relief is only by way of alternative to the relief otherwise provided in this opinion.
B. The lease was concealed from the Association. This was fraud in view of the duty to disclose. The lease is therefore unenforceable against the Association as to all units except those owned by (1) plaintiffs who were represented by counsel and (2) Joseph Berman.
C. The lease is declared to be unenforceable against the Association and its members because it was never adopted by the Association after its execution.
D. The recreation areas are owned by the residential unit owners; they are part of the common elements of the condominium property. Consequently, the lease has no validity: it leases nothing. Furthermore, the lease is in violation of the Condominium Act; it purported to demise a recreation unit with appurtenant common elements when, in fact, the landlord did not own a condominium unit and had conveyed 100% of the condominium's common elements to the unit owners. N.J.S.A. 46:8B-6. Under N.J.S.A. 46:8B-7 "any agreement contrary to the provision of this Act shall be void."
E. By reason of conclusions C and D above: The lease shall be cancelled of record. All rents paid thereunder shall be returned to the Association with interest at the rate of 8% per annum, for distribution to those unit owners past and present in proportion to the rents paid by each such owner.
F. Costs are awarded to plaintiffs.