ELIZABETH AND CLARENCE GRIFFITH, ET ALS, PLAINTIFFS, v. RITTENHOUSE PARK COMMUNITY ASSOCIATION, ET ALS., DEFENDANTS.

Superior Court of New Jersey
Chancery Division Burlington County

Decided December 12, 1986.

*Anthony J. Cavuto* for plaintiffs.

*Vincent D'Elia* for defendants (*Beck, D'Elia & Rosenberg,* attorneys).

HAINES, A.J.S.C.

The Rittenhouse Park Community Association is a nonprofit New Jersey corporation organized by Levitt and Sons, Inc. on April 10, 1967. Its purposes are to provide recreational facilities, maintenance and management services and architectural control for a community of 618 homes in Willingboro, New Jersey. A recorded declaration of covenants makes all homeowners members of the association automatically. Its operating expenses are met by levying assessments upon every property in the community, on a uniform basis as required by the declaration and the association's bylaws.

Until recently, the association provided lawn-mowing service to the community, a service which it discontinued for lack of funds. Its efforts to raise assessments through a required election process, were not successful; the necessary two-thirds vote of all members of the association could not be obtained. This suit, brought by 67 property owners against the association and its trustees, seeks an order mandating lawn-mowing services.

Defendants deny the existence of any obligation to provide such services and, alternatively, claim a right to discontinue even mandated services when they have no funds with which to pay for them. There is no authority in the association's organizing documents, applicable legislation or case law permitting such discontinuance. This opinion, following a trial of the issues, concludes that the association has an obligation to mow

the community's lawns. It holds, however, that it may discontinue the lawn service and/or other services in the absence of funds, notwithstanding the lack of any express authority for such action.

## A. *The Factual Findings and Their Consequences.*

A number of Rittenhouse property owners testified at the trial. It is clear from this testimony that the representatives of Levitt and Sons made written and verbal representations to those who ultimately became purchasers of properties in Rittenhouse Park that their lawns would be mowed. Among other things the purchasers were given a "Home Warranty" booklet which provided in part that

> Purchase of a home in Rittenhouse Park carries with it automatic membership in the Rittenhouse Park Community Association. The purpose of this community is . . .:
>
> > to relieve the homeowners of nuisance chores by providing for maintenance of all common areas including sidewalks, parking areas, front and side lawns, rear walkways.
>
> . . . .
>
> The homes in Rittenhouse Park have been made as maintenance free as the varied designs allow. Maintenance by the Association covers front and side lawn grass cutting. . . .

Some witnesses were original purchasers from Levitt, most were not. All of them were attracted to Rittenhouse Park, in part, by representations made to them by Levitt representatives, by subsequent homeowners, or by real estate sales personnel. Many remembered receiving the "Home Warranty" booklet; it is apparent that it was given to all purchasers of the Rittenhouse Park homes. All of them were interested in avoiding home maintenance obligations and relied upon the understanding that lawn care would be provided when they purchased their properties. In fact, the association mowed lawns for a substantial number of years, thus recognizing the obligation and making its own representation to all who cared to see.

448

The association denies any lawn-care obligation, relying upon its certificate of incorporation, the declaration of covenants and its bylaws, none of which impose that requirement. The association's position, however, is not tenable for two reasons: (1) it is estopped to deny the obligation and (2) it has a fiduciary duty to provide lawn care.

### (1) *Estoppel.*

■ Levitt's representatives promised lawn maintenance. They did so verbally and in written language that made the promise appear to be a part of the declaration of covenants. This is clear from the home warranty booklet which coupled lawn maintenance with other obligations in the declaration: "the maintenance of all common areas including sidewalks, parking areas, front and side lawns, rear walkways." Plaintiffs or their predecessors-in-title relied upon the promise when they purchased their Rittenhouse Park properties. Levitt, if a party to these proceedings, would be estopped to deny that lawn maintenance is included in the declaration of covenants. The association at the time the promise was made was the alter ego of Levitt and was therefore in no different position. It was and is estopped to deny the obligation. The rule is set forth in *Summer Cottagers' Assoc. of Cape May v. Cape May,* 19 *N.J.* 493 (1955):

> The doing or forbearing to do an act induced by the conduct of another may work an estoppel to avoid wrong or injury ensuing from reasonable reliance upon such conduct. The repudiation of one's act done or position assumed is not permissible where that course would work injustice to another who, having the right to do so, has relied thereon. [at 504]

### (2) *The Fiduciary Obligation.*

■ Levitt was the developer of Rittenhouse Park. Pursuant to the scheme set forth in the basic community documents, it was also the organizer of the association, its trustee (through a representative) and its controlling member until 550 properties were sold in Rittenhouse Park or until July 1, 1973, whichever first occurred. Levitt, as controller and trustee, occupied a

fiduciary position requiring it to act for the benefit of all Rittenhouse Park property owners, present and future. *Berman v. Gurwicz,* 189 *N.J.Super.* 89, 97 (Ch.Div.1981), aff'd 189 *N.J.Super.* 49 (App.Div.1983), certif. den. 94 *N.J.* 549 (1983). Hyatt, *Condominium and Homeowner Association Practice: Community Association Law* (A.L.I.1981), describes the position of the officers and directors of a community association:

> Through the very nature of the officer's or director's relations to the association, which are "created by law" and provide not only an opportunity but, indeed, an obligation in most cases "to exercise a controlling influence" over the rights, interests, and property of others, he or she is in a position of trust and confidence in respect to the other association members. As a consequence the individuals who serve as volunteer officers and directors are held to a high standard of conduct, the breach of which may well subject each of them or all of them to individual liability, notwithstanding the fact that each acts on behalf of the association. This high standard of conduct is, of course, the duty of the fiduciary. [at 59]

Levitt could not, as seller, make representations that lawns would be maintained, while avoiding that obligation through the association it controlled. To do so would constitute a breach of its fiduciary obligation. The lawn-care obligation, once assumed, continues. It is an obligation obviously intended to be passed from homeowner to homeowner as in the case of other maintenance obligations contained in the declaration of covenants.

The lawn-care obligation cannot be limited to original purchasers only or to those homeowners who are plaintiffs here. The trustees of the association represent *all* Rittenhouse Park homeowners and, as fiduciaries, are obliged to treat all property owners equally. *Restatement, Trusts* 2d, § 183 at 393 (1959); *Koretzky,* 8 *N.J.* 506, 530 (1951). Indeed article XII, § 4 of the bylaws provides that assessments "must be fixed at a uniform rate for all lots...." Consequently, the association cannot mow the lawns of a few and ignore the lawns of the rest, nor can it assess all for a benefit conferred only upon some.

It follows, therefore, that the association must mow the lawns of all the property owners in Rittenhouse Park. That obligation is as one with all the maintenance obligations contained in the declaration of covenants. Its cost is to be included in the property owner's assessments.

### B. *The Financial Problem and its Solution.*

The association argues that even if lawn care was required it was properly discontinued because it did not and does not have the financial capacity to perform all of the mandated homeowner's services and cannot achieve that capacity because the homeowners will not vote to increase their assessments. The claim that its resources are so limited is accepted as true for present purposes. No evidence to the contrary has been presented.

The association's decision to discontinue lawn-mowing services attracted this litigation. In so acting it relied, in part, upon its belief that it had no obligation to mow lawns. Since this opinion reaches the opposite conclusion, the question of the trustees' power to limit services must be addressed.

As noted above, the trustees of the association are fiduciaries—true trustees for the benefit of the homeowners they represent. The association's organizing documents, while not addressing the matter precisely, clearly intend the association to be operated for the benefit of all owners. The bylaws, for example, require assessments to be uniform. The documents lay out a general plan for the management of all 681 properties in Rittenhouse Park. These circumstances, standing alone, are enough to support a finding of a resulting trust relationship. Commentators have suggested that since persons operating community associations have fiduciary obligations "trust law appears to be the closest analogue." Reichman, "Residential Private Governments: An Introductory Survey," 43 *U.Chi.L. Rev.* 253, 296 (1976), which also says:

In fact the only doctrinal barrier to the use of the trust concept appears to be a problem in finding the intent to create a trust. In some cases the original

declaration may state that powers are to be exercised for the benefit of all the owners in the community. In such a case it is obvious that a trust was actually intended. In many other cases the declaration makes it clear that a general scheme is being created, that the individual lot owners have the right to enforce the restrictions, and that the discretionary powers are intended to aid in the achievement of the plan's objectives. Since the powers are explicitly reserved to serve the community's owners and not merely the interests of the developer, a trust could easily be implied.

. . . .

Once the developer or homeowners' association is found to hold powers in trust, a number of consequences follow. First the trustee is subject to a number of duties: the duty of *impartiality,* the duty of loyalty *and the duty of reasonable care.*

. . . .

Perhaps the most troublesome question relates to the "legislative" process of amending and terminating existing servitudes. The entity vested with such authority is expected to use it in an impartial and nonarbitrary manner. Usually, a probable contribution to the community's welfare suffices to uphold the measure.

. . . .

Similar considerations should guide judicial review of the residential private government's administrative process. Thus, *the association's income could not be used for purposes unrelated to the community welfare or to provide services in a discriminatory fashion.* [at 296–299; emphasis supplied]

Trustees, as such, are also obligated to act with ordinary prudence and to preserve the trust property. 2 *Scott, Trusts* (3 ed. 1967) advises:

Sec. 174. A trustee is under a duty in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property.

. . . .

Sec. 176. It is the duty of the trustee to use care and skill to preserve the trust property. The standard of care and skill which is applicable to this duty, as it is to his other duties, is that of a man of ordinary prudence.

When trustees provide mandated services for which they cannot pay they do not act prudently. If the trustees permit the association to become insolvent they may destroy it, thus breaching the obligation to preserve trust property and destroying all benefits otherwise available to its owner-members. In

reality, assessments are as mandatory as services; the former are absolutely necessary to the latter.

The members of the association, pursuant to the scheme established when Rittenhouse Park was created, are expected to pay for the services provided by the association through the assessment process. It is a matter of simple logic and obvious fairness that owner-members should not be permitted to demand services for which they can refuse to make payment. That is the position they are in. The board of trustees has tried to raise assessments to cover the services demanded and the association's members have refused to authorize the increase. Surely the members cannot be heard to complain of a loss of services occasioned by their own action.

The primary obligation of the trustees is to carry out the purposes of the association. The purposes set forth in the introduction to the members' manual (which also contains copies of the declaration of covenants and the bylaws of the association) are as follows:

1. To provide recreational facilities for all homeowners in the community. Such facilities include 3 private swim clubs supplemented by sports and picnic areas, and general park areas for play or leisure activities.

2. To relieve the homeowners of nuisance chores by providing for maintenance of all common areas, lawn mowing and snow removal.

3. To provide for the maintenance, management, preservation and architectural control of the community.

Necessarily underlining these purposes is the assessment authority given to the trustees of the association when it was formed. Unless the assessment power is used effectively the association cannot fulfill the purposes for which it was organized. It is therefore apparent that the trustees must have the power to reduce services when its power to raise money has been denied by the election process. If they cannot do so, they will be frustrated in their efforts to carry out any of the association's basic purposes, thereby completely ignoring their primary fiduciary obligation.

■ This conclusion is supported by more than logic. *N.J. S.A.* 15A:3–1a(16), following a list of general powers, provides

that every nonprofit corporation, "subject to any limitations provided ... in its certificate of incorporation or bylaws" may "have and exercise all other powers necessary or convenient to effect any of the purposes for which the corporation is organized." The bylaws of the association, article VIII, § 1(b), provide that "the Board of Trustees shall have power to exercise for the Association all powers, duties and authority vested in or delegated to this Association and not reserved to the membership by other provisions of these bylaws, the articles of incorporation or Declaration [of Covenants]...." The certificate of incorporation, bylaws and declaration are silent as to the power of either the trustees or the membership to discontinue mandated services in the event the association lacks funds with which to pay for them. When services can be performed in full only by plunging the association into debt, the association cannot long survive and, if it does not, the purposes for which it was formed will not be carried out. Therefore, since the organizing documents of the association are silent as to the power to reduce services and the bylaws permit the board of trustees to exercise powers delegated to the association and not reserved to the membership, the general power given to the association by *N.J.S.A.* 15A:3-1a(16) is available. That is the power "necessary or convenient to effect any of the purposes for which the corporation is organized," a power broad enough to permit the association to discontinue services in order to preserve its solvency.

The bylaws and declaration are sensitive to the need of the association to have sufficient monies, raised through the assessment process, to pay for services. Article V, § 3 of the declaration, also incorporated in the bylaws, provides:

> The Board of Trustees of the Association may, after consideration of current maintenance costs and future needs of the Association, fix the actual assessment for any year at a lesser amount, provided that it shall be an affirmative obligation of the Association and the Board of Trustees, to fix such assessments at an amount sufficient to maintain and operate common areas and facilities.

Thus, while the right of the board to lower assessments is tempered by the obligation to meet expenses, there is no

tempering of the members' right to defeat assessments by the same obligation. It is this omission which caused the present litigation and which brings into play the general powers of the association through its trustees to modify services.

Basic trust law provides the final support for the conclusions reached here. The trustees of the association are obliged as fiduciaries to act prudently and to preserve the trust property. Those paramount duties must prevail over the obligation of the trustees to provide services.

### C. *CONCLUSION.*

 Lawn care is a mandated obligation of the association. It is within the declaration of covenants. However, when the members of the association refuse to approve an increase in assessments needed to pay for all mandated services, the board of trustees of the association, acting prudently, may reduce such services, choosing among them as it deems appropriate, to the extent necessary, to avoid incurring any inadvisable debt. In the present case, the decision of the board of trustees to discontinue lawn-mowing services because it lacked funds to pay for them was reasonable and proper.