657 A.2d 420

JOANNE STRAWN, GERALD L. STRAWN, TRACEY A. STRAWN AND BRANDON M. STRAWN, BY THEIR GUARDIAN AD LITEM JOANNE STRAWN, RUSSELL C. BURTON, AND BRETT C. BURTON, BY HIS GUARDIAN AD LITEM RUSSELL C. BURTON, ANTHONY ALVAREZ, RITA ALVAREZ, LISA ALVAREZ, JOHN M. GAVEN, SR., ANNETTE M. GAVEN, AND JOHN

M. GAVEN, JR., YOUNG D. KIM, JULIA S. KIM AND PATRICK
KIM AND ROY KIM, BY THEIR GUARDIAN AD LITEM YOUNG
D. KIM, ALBERT WILLIAMS, EVELYN WILLIAMS AND STE-
PHEN WILLIAMS, PLAINTIFFS–RESPONDENTS, AND MARIE
C. INCOLLINGO, ANTHONY F. INCOLLINGO, MICHELLE M.
INCOLLINGO, NANCY ANN INCOLLINGO, FRANK CARNOT,
RAFFAELA CARNOT, WILLIAM DENNIS, JACQUELINE DEN-
NIS, NICOLE M. DENNIS AND FARRAH D. DENNIS, BY
THEIR GUARDIAN AD LITEM JACQUELINE DENNIS, MI-
CHAEL POWELL, DOROTHY POWELL, AMY POWELL AND
MOLLY POWELL, BY THEIR GUARDIAN AD LITEM DORO-
THY POWELL, MICHAEL J. VITARELLI, SR., LOIS A. VITAR-
ELLI, AND JACQUELINE VITARELLI, LESLIE VITARELLI,
MICHAEL VITARELLI, JR. AND ANTHONY VITARELLI, BY
THEIR GUARDIAN AD LITEM LOIS VITARELLI, CHRISTO-
PHER CONTI, ELAYNE CONTI, DANA MARIE CONTI AND
GINA CHRISTINE CONTI, BY THEIR GUARDIAN AD LITEM
ELAYNE CONTI, EUGENE E. JARON, ANN T. JARON, KATH-
LEEN A. JARON, STEPHEN M. JARON, PAUL M. KRAMER,
PATRICIA G. KRAMER, DREW KRAMER AND LAUREN
KRAMER, BY THEIR GUARDIAN AD LITEM PATRICIA G.
KRAMER, SANDY OBLENA, ESTRELLA OBLENA, NATHANI-
EL OBLENA AND MICHAEL OBLENA, BY THEIR GUARDIAN
AD LITEM SANDY OBLENA, WILLIAM HELBLING, ANTHO-
NY CHAPMAN, CATHARINE CHAPMAN, DAVID CHAPMAN
AND ADRIANE CHAPMAN, BY THEIR GUARDIAN AD LITEM
CATHARINE CHAPMAN, JAY AGNES, JACQUELINE AGNES,
ROBERT LEWIS, CELINE LEWIS AND STEPHANIE LEWIS,
BY HER GUARDIAN AD LITEM ROBERT LEWIS, TRUDY
BECMER, EDMUND BECMER, DEBRA MURACA, FRANK MU-
RACA, DAVID BARD, RUTH BARD, HOWARD FRIEDMAN, DE-
BRA FRIEDMAN AND MICHELLE FRIEDMAN, BY HER
GUARDIAN AD LITEM DEBRA FRIEDMAN, MARIANO A. PIN-
IZZOTTO, ROSEMARY J. PINIZZOTTO, AND MARIE ROSE
PINIZZOTTO BY HER GUARDIAN AD LITEM MARIANO A.
PINIZZOTTO, CHESTER A. RIDDICK, JR., CARMELITA D.
RIDDICK, TODD RIDDICK, AND ALLEN RIDDICK, BY HIS
GUARDIAN AD LITEM, CARMELITA D. RIDDICK, MARTIN V.
GOLDSTEIN, PATRICIA M. CORSON, FREDERICK E. CHINK,
MARIA P. CHINK, MARIO CHINK AND CHRISTINA CHINK,
BY THEIR GUARDIAN AD LITEM, FREDERICK E. CHINK,

RICHARD J. NELSON AND MARY ANN NELSON, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS, v. JOHN B. CANUSO, SR., JOHN B. CANUSO, JR., CANETIC CORPORATION, CANUSO MANAGEMENT CORPORATION, AND FOX & LAZO INC., DEFENDANTS–APPELLANTS, AND JOCAN, INC., WEICHERT REALTORS, JOHN DOE (ONE) THROUGH JOHN DOE (TWENTY), AND DOE CORPORATION (ONE) THROUGH DOE CORPORATION (TWENTY), DEFENDANTS.

Argued January 4, 1995—Decided April 25, 1995.

46

*Alan Greenberg* argued the cause for appellants John B. Canuso, Sr., John B. Canuso, Jr., Canetic Corporation, Canuso Management Corporation, (*Rawle & Henderson*, attorneys; *Mr. Greenberg* and *Joanne Stipick*, on the brief).

*Theodore W. Geiser* argued the cause for appellant Fox & Lazo, Inc. (*Begley, McCloskey & Gaskill*, attorneys; *Gregory R. McCloskey*, of counsel and on the brief).

*Mark R. Rosen* argued the cause for respondents (*Mesirov, Gelman, Jaffe, Cramer & Jamieson* and *Williams & Cuker*, attorneys; *Mr. Rosen* and *Mark R. Cuker*, of counsel and on the brief).

*Arthur M. Greenbaum* submitted a brief on behalf of *amicus curiae* New Jersey Association of Realtors (*Greenbaum, Rowe, Smith, Ravin & Davis*, attorneys; *Mr. Greenbaum*, of counsel; *Mr. Greenbaum, Peter A. Buchsbaum*, and *Bruce D. Greenberg*, on the brief).

*Henry A. Hill* submitted a brief on behalf of *amicus curiae* New Jersey Builders Association (*Hill Wallack*, attorneys; *Mr. Hill* and *Thomas F. Carroll, III*, on the brief).

*Alan H. Sklarsky* submitted a brief on behalf of *amicus curiae* Association of Trial Lawyers of America–New Jersey (*Tomar, Simonoff, Adourian & O'Brien*, attorneys; *Mr. Sklarsky* and *Franklin P. Solomon*, on the brief).

The opinion of the Court was delivered by

O'HERN, J.

■ Because this case arises from a motion for summary judgment, we must view the facts that may be inferred from the pleadings and discovery in the light most favorable to plaintiffs. In that light, the issue in this case is whether a builder-developer

of new homes and the brokers marketing those homes have a duty to disclose to prospective buyers that the homes have been constructed near an abandoned hazardous-waste dump. The Appellate Division held that such a duty exists. We agree and affirm the judgment of the Appellate Division primarily for the reasons stated in its opinion.

I

The facts of the case are set forth in the reported opinion of the Appellate Division. *Strawn v. Canuso,* 271 *N.J.Super.* 88, 95–100, 638 *A.*2d 141 (1994). The case concerns the claims of more than 150 families seeking damages because the new homes that they bought in Voorhees Township, New Jersey, were constructed near a hazardous-waste dump site, known as the Buzby Landfill. The complaint named as defendants John B. Canuso, Sr., and John B. Canuso, Jr., and their companies: Canetic Corporation and Canuso Management Corporation. Fox & Lazo Inc. (Fox & Lazo), the brokerage firm that was the selling agent for the development, was also named as a codefendant.

Plaintiffs base their claims on common-law principles of fraud and negligent misrepresentation, and the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –66. The twenty-six plaintiff-families filed a class-action lawsuit on behalf of all of the purchasers of the homes in the development sold by defendants. Those families purchased their homes between 1984 and 1987.

The Buzby Landfill consists of two tracts of property, a nineteen-acre portion owned by RCA and a contiguous thirty-seven-acre parcel now owned by Voorhees Township. Those two tracts were the site of a landfill from 1966 to 1978. Although the Buzby Landfill was not licensed to receive liquid-industrial or chemical wastes, large amounts of hazardous materials and chemicals were dumped there. The landfill was also plagued by fires.

Toxic wastes dumped in the Buzby Landfill began to escape because it had no liner or cap. Tests done by the New Jersey Department of Environmental Protection and Energy (DEPE) revealed that leachate was seeping from the landfill into a downstream lake. The DEPE estimated that half of the landfill

material was submerged in ground water, thereby contaminating the ground water with hazardous substances. Additional tests indicated the presence of hazardous waste in ground water, in marsh sediments taken from the landfill, and in lakes southeast of the landfill.

RCA installed a system at the landfill to vent excessive levels of methane gas at the site. DEPE's site manager discovered gas leaks in that venting system. Those leaks released contaminants, including benzene and other volatile organic compounds. In 1986, methane gases, which naturally accumulate in landfills, emanated from the dump site. Reports of the federal Environmental Protection Agency (EPA) confirm that residents' complaints about odors and associated physical symptoms are consistent with expected reactions to exposure to gases from the landfill. EPA recommended that the site be considered for a Superfund cleanup.

Plaintiffs allege that the developers knew of the Buzby Landfill before they considered the site for residential development. Plaintiffs contend that although defendants were specifically aware of the existence and hazards of the landfill, they did not disclose those facts to plaintiffs when they bought their homes. A 1980 EPA report warned: "The proposed housing development on land adjacent to the site has all the potential of developing into a future Love Canal if construction is permitted." A copy of the EPA report was in the Canuso defendants' files. Those defendants also met with a DEPE employee to discuss the prospects of building homes near the landfill. (Later reports of regulatory agencies tempered those earlier reports, one of which described any risk as "indeterminate." We also note that such reports may contain hearsay and, therefore, may be inadmissible at trial.)

In addition, one of Fox & Lazo's marketing directors urged his firm and the individual Canuso defendants to disclose the existence of the Buzby Landfill to home buyers. Each refused that request and instead followed a policy of nondisclosure. That policy continued even after early purchasers complained about odors. Defendants' representatives were instructed never to disclose the existence of the Buzby Landfill, even when asked about such conditions. Later, some prospective home buyers, having

independently learned about the Buzby Landfill, refused to convert their initial non-binding deposits into enforceable agreements of sale.

John Canuso, Jr., who personally supervised the sales force, instructed his sales manager to ascertain what information DEPE was providing to people who asked about the landfill. The sales manager spoke with a DEPE representative, who again warned defendants of the problems of building a large development near the landfill. The sales manager repeated in a memorandum the warnings given to her by the DEPE employee and placed the memorandum with related papers in a "hazardous waste" file that the Canuso defendants maintained. John Canuso, Jr., discussed this memorandum with his father, John Canuso, Sr., who refused to disclose to home buyers the proximity of the landfill.

Plaintiffs sought class certification of their action on behalf of more than 150 families who bought those homes in Voorhees Township. The trial court ruled that plaintiffs had failed to establish the predominance of common issues sufficient to warrant certification.

We note that the trial court undertook an exhaustive and painstaking review of the issues, arguments, and precedent presented by the parties. For example, it heard more than two dozen motions for summary judgment concerning various plaintiffs. The trial court considered *Jones v. Sportelli,* 166 *N.J.Super.* 383, 389, 399 *A.*2d 1047 (Law Div.1979) (discussing the Consumer Fraud Act's application to manufacturer of prescription-legend product, but failing to resolve scope of manufacturer's duty to warn ultimate consumers of risks attendant on the product's use). Also, it reasoned that reliance on sales brochures by the buyers was misplaced, because the brochures contained only commercial promotion. The court relied on our decision in *Rodio v. Smith,* 123 *N.J.* 345, 351–52, 587 *A.*2d 621 (1991) (concluding that familiar "You're in good hands with Allstate" slogan was only "puffery" and did not violate Consumer Fraud Act). The colloquy between

the court and counsel reveals an extensive evaluation of case law by the court.

On defendants' motions for summary judgment against the individual plaintiffs, the trial court ruled that "there is no duty that the owner of lands owe[s] to a prospective purchaser to disclose to that prospective purchaser the conditions of somebody else's property," but added that if the sellers made a statement concerning someone else's property they could be liable for their affirmative misrepresentations. The trial judge granted summary judgment dismissing all of the claims of seven plaintiff-families. (The nineteen other plaintiff-families who asserted that affirmative misrepresentations had been made to them were granted jury trials on common-law fraud and Consumer Fraud Act claims.)

The seven plaintiff-families sought leave to appeal to the Appellate Division. After granting leave to appeal, the Appellate Division held that the builders and brokers of the new multi-home development had a duty to disclose to potential buyers the existence of a nearby, closed landfill. Specifically, the court stated:

> [W]e conclude that the developer-seller of residential housing in multi-home developments and their agents, have a duty to disclose the existence of off-site conditions, which (1) are unknown to the buyers, (2) are known or should have been known to the seller and/or its broker, and (3) based on reasonable foreseeability, might materially affect the value or the desirability of the property involved in the transaction. Since the brokers are agents of the seller, their duty to the purchasers is at least coextensive with that of the seller.
>
> Imposition of this duty comports with modern notions of justice, fair dealing and sound public policy of protecting home buyers in large developments who have limited bargaining power. They also tend to rely on the seller's and broker's knowledge concerning factors affecting the market value. Where, as here, a duty to speak exists, the failure to speak constitutes unfair conduct likely to cause harm.
>
> [271 *N.J.Super.* at 104, 638 *A.*2d 141.]

The Appellate Division also concluded that class certification should have been granted. It reasoned that "plaintiffs [sought] to redress a common legal grievance" and therefore class certification was required. *Id.* at 111, 638 *A.*2d 141. The Appellate Division, however, held that the corporate-officer defendants, John Canuso, Sr., and John Canuso, Jr., should not be held personally liable and affirmed the trial court's decision on that issue. It

noted that its "review of the appellate record fail[ed] to disclose any evidence that those officers could be held personally responsible." *Id.* at 109, 638 *A.*2d 141. We granted defendants' motion for leave to appeal. 137 *N.J.* 303, 645 *A.*2d 134 (1994).

## II

Justice Holmes once noted that "whenever we trace a leading doctrine of substantive law far enough back, we are very likely to find some forgotten circumstance of procedure at its source." Oliver W. Holmes, Jr., *The Common Law* 253 (1881). The forgotten circumstance in this case is not one of procedure, but Justice Holmes' observation is relevant to the law of real property, which is firmly grounded in history. For example, the concept of estates in land continues to influence our law of landowners' liability to the extent that liability depends on the status of the person on the property. Was the person a trespasser, a licensee, or an invitee? *See Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 435–38, 625 *A.*2d 1110 (1993) (discussing the guidance provided by such traditional classifications).

Only gradually has the law of real property assimilated other principles of law. One commentator observed that "the law offers more protection to a person buying a dog leash than it does to the purchaser of a house." John H. Scheid, Jr., Note, *Mandatory Disclosure Law: A Statute for Illinois,* 27 *J.Marshall L.Rev.* 155, 160 (1993) (citing Paul G. Haskell, *The Case for an Implied Warranty of Quality in Sales of Real Property,* 53 *Geo.L.J.* 633 (1965)). For years, "[c]ourts continued to cling to the notion that a seller had no duty whatsoever to disclose anything to the buyer." *Ibid.* That attitude endured, though the purchase of a home "is almost always the most important transaction [one] will ever undertake." *In re Opinion No. 26 of the Committee on the Unauthorized Practice of Law,* 139 *N.J.* 323, 328, 654 *A.*2d 1344 (1995).

The lack of protection afforded to purchasers of real property remained even though principles of commercial marketability had long since been infused into most business transactions. "Profes-

sor Karl Llewellyn stated during the New York Law Revision Commission's hearings in 1954 that 'good faith has been a part of mercantile obligation since American law began.'" Stephen J. Burton, *Good Faith in Articles 1 and 2 of the U.C.C.: The Practice View,* 35 *Wm. & Mary L.Rev.* 1533, 1533 n. 2 (1994) (quoting Karl N. Llewellyn, Memorandum, 1 *State of N.Y.Law Revision Comm'n Report: Hearings on the Uniform Commercial Code* 106, 115 (reprint ed. 1980) (1954)). In calling for securities reform in his message to Congress in 1933, President Franklin D. Roosevelt suggested that to the rule of *caveat emptor* should be added, "[L]et the seller also beware." H.R.Rep. No. 85, 73d Cong., 1st Sess. 2 (1933); S.Rep. No. 47, 73d Cong., 1st Sess. 6 (1933).

■ However, in the field of real property, the doctrine of *caveat emptor* survived into the first half of the twentieth century. Generally speaking, "the principle of *caveat emptor* dictates that in the absence of express agreement, a seller is not liable to the buyer or others for the condition of the land existing at the time of transfer." *T & E Indus., Inc. v. Safety Light Corp.,* 123 *N.J.* 371, 387, 587 *A.*2d 1249 (1991) (citing *Restatement (Second) of Torts* § 352 comment a (1977)). Legal historians will continue to debate whether the doctrine of *caveat emptor* was the creation of laissez-faire judges or merely a rule of legal convenience reflecting the fact that most land transactions involved vacant land. Professor Morton Horwitz believes that it was the former. Morton J. Horwitz, *The Transformation of American Law, 1780–1860,* at 102, 107–08 (1977). Professor Cornelius Moynihan has suggested a less sinister origin. He explained that after the Norman Conquest, the King became the owner of all land and transferred some of it to soldiers for payment of military duties and, as such, the grantees were unlikely to complain about any defects. Cornelius J. Moynihan, *A Preliminary Survey of the Law of Real Property,* 3–4 (1940).

### III

Whatever its origins or purposes, "the rule of *caveat emptor* has not retained its original vitality. With time, and in differing

contexts, we have on many occasions questioned the justification for the rule." *T & E Indus., Inc., supra,* 123 *N.J.* at 388, 587 *A.*2d 1249. In *Michaels v. Brookchester, Inc.,* 26 *N.J.* 379, 382, 140 *A.*2d 199 (1958), this Court recognized that the doctrine of *caveat emptor* no longer applied to leasehold interests in property. We stated: "This principle [*caveat emptor*], suitable for the agrarian setting in which it was conceived, lagged behind changes in dwelling habits and economic realities." *Ibid.* (citing 1 *America Law of Property* § 3.78 (1952)).

Exceptions to the broad immunity of *caveat emptor* inevitably developed in the sale of land. In *Schipper v. Levitt & Sons, Inc.,* 44 *N.J.* 70, 207 *A.*2d 314 (1965), the Court held that a builder-developer of real estate gave an implied warranty that the structure it built would be properly constructed—a warranty of its habitability. The Court said:

> The arguments advanced by [the builder] in opposition to the application of warranty or strict liability principles appear to us to lack substantial merit. Thus its contention that *caveat emptor* should be applied and the deed viewed as embodying all the rights and responsibilities of the parties disregards the realities of the situation. *Caveat emptor* developed when the buyer and seller were in an equal bargaining position and they could readily be expected to protect themselves in the deed. Buyers of mass produced development homes are not on an equal footing with the builder vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in a bill of sale.
>
> [*Id.* at 91–92, 207 *A.*2d 314.]

In *McDonald v. Mianecki,* 79 *N.J.* 275, 298, 398 *A.*2d 1283 (1979), the Court extended the principles of *Schipper, supra,* 44 *N.J.* 70, 207 *A.*2d 314, to a small-scale builder of new homes and held that an implied warranty of habitability included a potable water supply. The Court used the occasion to note that the doctrine of *caveat emptor* "as applied to new houses is an anachronism patently out of harmony with modern home buying practices." *Id.* at 290, 398 *A.*2d 1283 (quoting *Humber v. Morton,* 426 *S.W.*2d 554, 562 (Tex.1968)).

Finally, in *Weintraub v. Krobatsch,* 64 *N.J.* 445, 455–56, 317 *A.*2d 68 (1974), the Court ruled that a seller of real estate had an

obligation to disclose the existence of roach infestation unknown to the buyers. The Court noted that in certain circumstances " 'silence may be fraudulent.' " *Id.* at 449, 317 *A.*2d 68 (quoting *Keen v. James,* 39 *N.J.Eq.* 527, 540 (E. & A.1885)). Further, "relief may be granted to one contractual party where the other suppresses facts," *ibid.,* that he or she "under the circumstances, is bound in conscience and duty to disclose to the other party, and in respect to which he cannot, innocently, be silent." *Conover v. Wardell,* 22 *N.J.Eq.* 492, 498–99 (E. & A.1871).

■ In short, *"[c]aveat emptor,* the early rule, no longer prevails in New Jersey." *Berman v. Gurwicz,* 189 *N.J.Super.* 89, 93, 458 *A.*2d 1311 (Ch.Div.1981) (citing *Weintraub, supra,* 64 *N.J.* at 455, 317 *A.*2d 68), *aff'd,* 189 *N.J.Super.* 49, 458 *A.*2d 1289 (App. Div.), *certif. denied,* 94 *N.J.* 549, 468 *A.*2d 197 (1983).

## IV

Other jurisdictions have limited the doctrine of *caveat emptor.* In California, when the seller knows of facts materially affecting the value or desirability of property and the seller also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer, the seller is subject to a duty to disclose those facts to the buyer. *Lingsch v. Savage,* 213 *Cal.App.*2d 729, 29 *Cal.Rptr.* 201, 209 (1963); *see also Easton v. Strassburger,* 152 *Cal.App.*3d 90, 199 *Cal.Rptr.* 383 (1984) (imposing duty on broker to inspect property listed for sale to determine whether settlement or erosion problems are likely to occur and to disclose such information to prospective purchasers). In *Lingsch,* the court determined that the real estate agent or broker representing the seller is a party to the business transaction. It stated:

In most instances [the broker] has a personal interest in [the transaction] and derives a profit from it. Where such agent or broker possesses, along with the seller, the requisite knowledge according to the foregoing decisions, whether [the broker] acquires it from, or independently of, [the] principal, [the broker] is under the same duty of disclosure. [The broker] is a party connected with the fraud and if no disclosure is made at all to the buyer by the other parties to the transaction,

such agent or broker becomes jointly and severally liable with the seller for the full amount of the damages.

[29 *Cal.Rptr.* at 205 (footnote omitted).]

One author has noted:

California and Colorado courts have taken the lead in imposing on sellers affirmative obligations to disclose matters materially affecting the value of the property. This information disclosure obligation applies broadly and includes defects in construction and soil conditions as well as matters wholly external to the property that appreciably affect its value.

    \*      \*      \*      \*      \*      \*      \*      \*

Sellers generally need disclose only matters of which they have some degree of personal knowledge. Thus, the complicated issue of a seller's knowledge remains a major matter of dispute. Sellers, moreover, need only disclose matters not reasonably ascertainable by the buyer, a limit that denies relief to buyers who should have known the relevant information. Under some formulations of the duty the seller must also know or suspect that the buyer is acting in ignorance. Different jurisdictions limit relief in other ways. Wisconsin, for example, only imposes disclosure duties on professional sellers.

[Eric T. Freyfogle, *Real Estate Sales and the New Implied Warranty of Lawful Use,* 71 *Cornell L.Rev.* 1, 25–28 (1985) (footnotes omitted).]

Other jurisdictions have imposed duties on brokers through consumer-protection legislation. *See Buzzard v. Bolger,* 117 *Ill. App.*3d 887, 73 *Ill.Dec.* 140, 453 *N.E.*2d 1129 (1983) (buyer may sue broker under consumer-fraud and deceptive-trade-practices statutes for broker's misstatement as to condition of premises); *Strauss v. Latter and Blum, Inc.,* 431 *So.*2d 9 (La.Ct.App.) (broker liable for nondisclosure under state deceptive-trade-practices statute if defect known to broker), *cert. denied,* 438 *So.*2d 572 (La.1983); *Mongeau v. Boutelle,* 10 *Mass.App.* 246, 407 *N.E.*2d 352 (1980) (broker's failure to disclose material fact that might influence buyer is actionable under state deceptive-practices statute).

We need not debate the outer limits of the duty to disclose. Some courts have gone well beyond the confines of this case. In *Reed v. King,* 145 *Cal.App.*3d 261, 193 *Cal.Rptr.* 130 (1983), the court imposed a duty on the seller to disclose that a property had been the scene of a mass murder several years earlier. And in New York's so-called "poltergeist case," the purchaser argued that the presence of such spirits in his new home was a material

element of the sale that should have been disclosed. The court agreed and imposed a duty on the seller to disclose that the property had been haunted. *Stambovsky v. Ackley*, 169 *A.D.*2d 254, 572 *N.Y.S.*2d 672 (1991).[1]

As of 1988, the courts of only California, New Mexico, and Utah had "advanced the law of real estate beyond fraud to simple negligence by establishing an affirmative duty to buyers to investigate the property for material defects." Sarah Waldstein, *A Toxic Nightmare on Elm Street: Negligence and the Real Estate Broker's Duty in Selling Previously Contaminated Residential Property*, 15 *B.C.Envtl.Aff.L.Rev.* 547, 551 (1988). Several jurisdictions have responded to such developments with statutory amendments. California and Illinois have adopted mandatory disclosure laws. *Cal.Civ.Code* §§ 1102 to 1102.15; *Ill.Ann.Stat.* ch. 765, para. 77/1 to /99. Other states have similar laws. *See* Scheid, *supra*, 27 *J.Marshall L.Rev.* at 156, 187. Codification of the limits of disclosure is a difficult task. For example, in California the form in use requires disclosure of whether the seller is aware of "[f]ill (compacted or otherwise) on the property or any portion thereof" or "[n]eighborhood noise problems or other nuisances." *Cal.Civ.Code* § 1102.6. If this case were to arise in California, an issue would be whether an abandoned hazardous-waste site in the neighborhood constitutes a nuisance.

## V

In the absence of such legislation or other regulatory requirements affecting real estate brokers, the question is whether our

---

[1] *Stambovsky* and *Reed* involved "stigmatized property," which has been defined as "property psychologically impacted by an event which occurred or was suspected to have occurred on the property, such event being one that has no physical impact of any kind." National Association of Realtors, *Study Guide: Stigmatized Property* 2 (1990), *quoted in* Robert M. Morgan, *The Expansion of the Duty of Disclosure in Real Estate Transactions: It's Not Just For Sellers Anymore*, *Fla.B.J.*, Feb. 1994, at 31. Some states have enacted legislation to provide guidance regarding the types of nonphysical or emotional defects that are material. *See, e.g., Fla.Stat.Ann.* § 689.25. New Jersey has no such legislation, and we do not address the materiality of such conditions.

common-law precedent would require disclosure of off-site conditions that materially affect the value of property.[2] By its favorable citation of California precedent, *Weintraub, supra,* 64 *N.J.* at 454–55, 317 *A.*2d 68, establishes that a seller of real estate or a broker representing the seller would be liable for nondisclosure of on-site defective conditions if those conditions were known to them and unknown and not readily observable by the buyer. Such conditions, for example, would include radon contamination and a polluted water supply. Whether and to what extent we should extend this duty to off-site conditions depends on an assessment of the various policies that have shaped the development of our law in this area.[3]

As noted, the principal factors shaping the duty to disclose have been the difference in bargaining power between the professional seller of residential real estate and the purchaser of such housing, *McDonald, supra,* 79 *N.J.* at 289–90, 398 *A.*2d 1283; *Schipper, supra,* 44 *N.J.* at 91–92, 207 *A.*2d 314, and the difference in access to information between the seller and the buyer, *Weintraub, supra,* 64 *N.J.* at 455–56, 317 *A.*2d 68. Those principles guide our decision in this case.

The first factor causes us to limit our holding to professional sellers of residential housing (persons engaged in the business of building or developing residential housing) and the brokers representing them. Neither the reseller of residential real estate nor the seller of commercial property has that same advantage in the

---

[2] We note, however, that on July 1, 1995, written agency disclosure in real estate transactions will become mandatory. *N.J.A.C.* 11:5–1.43. Under that provision a real estate agent must disclose whether he or she is representing the seller or the buyer, or acting as a dual agent or a transaction broker. 27 *N.J.R.* 706 (February 21, 1995).

[3] California cases have extended this duty to some off-site conditions. *See Barnhouse v. Pinole,* 133 *Cal.App.*3d 171, 183 *Cal.Rptr.* 881 (1982) (developer's failure to disclose to initial purchaser of house in subdivision existence of seeps, springs, and slides near the property was actionable); *Buist v. C. Dudley De Velbiss Corp.,* 182 *Cal.App.*2d 325, 6 *Cal.Rptr.* 259 (1960) (contractor's failure to disclose that lot was in area of ancient slide was fraudulent).

60

bargaining process. Regarding the second factor, professional sellers of residential housing and their brokers enjoy markedly superior access to information. Hence, we believe that it is reasonable to extend to such professionals a similar duty to disclose off-site conditions that materially affect the value or desirability of the property.

In addition, we note that the policies of New Jersey's Consumer Fraud Act apply to commercial sellers of real estate and brokers engaged in such transactions. "[T]he [Consumer Fraud] Act was intended as a response only to the public harm resulting from ' * * * unconscionable practices engaged in by professional sellers seeking mass distribution of many types of consumer goods,' and not to the isolated sale of a single family residence by its owner." *DiBernardo v. Mosley*, 206 *N.J.Super.* 371, 376, 502 *A*.2d 1166 (App.Div.) (quoting *Kugler v. Romain*, 58 *N.J.* 522, 536, 279 *A*.2d 640 (1971)), *certif. denied*, 103 *N.J.* 503, 511 *A*.2d 673 (1986). Real estate brokers, agents, and salespersons representing professional sellers of real estate are subject to the provisions of the Consumer Fraud Act. *Arroyo v. Arnold–Baker & Assocs., Inc.*, 206 *N.J.Super.* 294, 297, 502 *A*.2d 106 (Law Div.1985).

Practices prohibited by the Consumer Fraud Act include affirmative acts and acts of omission. Consumer fraud consisting of affirmative acts does not require a showing of intent. To hold a defendant liable for an act of omission, however, requires a finding that defendant acted "knowingly." *Chattin v. Cape May Greene, Inc.*, 243 *N.J.Super.* 590, 598–99, 581 *A*.2d 91 (App.Div.1990), *aff'd o.b.*, 124 *N.J.* 520, 591 *A*.2d 943 (1991). The Consumer Fraud Act states that "the *omission of any material fact* with intent that others rely upon such * * * omission, in connection with the sale * * * of * * * real estate" is an "unlawful practice." *N.J.S.A.* 56:8–2 (emphasis added). A "material fact" is not confined to conditions on the premises. Defendants, however, would have us limit their liability to nondisclosures violative of *Restatement (Second) of Torts* § 551 (1977). That is, the conduct must be the

equivalent of "swindling" or "shocking to the ethical sense of the community." *Restatement (Second) of Torts* § 551(2)(e) comment 1 (1977). When conduct rises to that level, a purchaser may recover treble damages for any ascertainable loss, plus reasonable attorney's fees under the Consumer Fraud Act. *Cox v. Sears Roebuck & Co.*, 138 *N.J.* 2, 24, 647 *A.2d* 454 (1994).

■ Short of that showing of unconscionability, a purchaser may establish a common-law claim by showing that the seller's or the broker's nondisclosure of material facts induced the purchaser to buy. In *Tobin v. Paparone Construction Co.*, 137 *N.J.Super.* 518, 349 *A.2d* 574 (Law Div.1975), the seller of residential property was held liable for failing to disclose that tennis courts would be constructed on an adjoining property. That court said: "Tobin properly relied on Paparone's representations as to the character of the surrounding neighborhood. Paparone's silence created a mistaken impression on the part of the purchaser which operated to induce the purchaser to buy. This silence was a fraudulent representation and a failure of an implicit condition of sale." *Id.* at 526, 349 *A.2d* 574.

The silence of the Fox & Lazo representatives and the Canuso Management Corporation's principals and employees "created a mistaken impression on the part of the purchaser." Defendants used sales-promotion brochures, newspaper advertisements, and a fact sheet to sell the homes in the development. That material portrayed the development as located in a peaceful, bucolic setting with an abundance of fresh air and clean lake waters. Although the literature mentioned how far the property was from malls, country clubs, and train stations, "neither the brochures, the newspaper advertisements nor any sales personnel mentioned that a landfill [was] located within half a mile of some of the homes." 271 *N.J.Super.* at 96, 638 *A.2d* 141. Unlike the slogan in *Rodio, supra*, 123 *N.J.* 345, 587 *A.2d* 621, these materials address factual matters.

In *Berman, supra*, 189 *N.J.Super.* at 95–96, 458 *A.2d* 1311, the seller of condominium units failed to disclose to buyers that use of

the complex's recreational facilities, which were separate from the condominiums, was not encompassed in the individual purchase agreements of the buyers. *Berman, supra,* 189 *N.J.Super.* at 94, 458 *A.*2d 1311, quoted the rule set forth in *Jewish Center of Sussex County v. Whale,* 165 *N.J.Super.* 84, 89, 397 *A.*2d 712 (Ch.Div.1978), *aff'd,* 172 *N.J.Super.* 165, 411 *A.*2d 475 (App.Div. 1980):

> "The fact that no affirmative misrepresentation of a material fact has been made does not bar relief. The suppression of truth, the withholding of the truth when it should be disclosed, is equivalent to the expression of falsehood. The question under those circumstances is whether the failure to volunteer disclosure of certain facts amounts to fraudulent concealment, or, more specifically, whether the defendant is bound in conscience and duty to recognize that the facts so concealed are significant and material and are facts in respect to which he [or she] cannot innocently be silent. Where the circumstances warrant the conclusion that [the seller] is so bound and has such a duty, equity will provide relief."

The *Berman* court determined that "[t]he existence of the recreational lease, which imposed substantial financial burdens upon buyers, was material and adverse," and its existence "was not apparent from an inspection of the property." 189 *N.J.Super.* at 95, 458 *A.*2d 1311. An illustration of the recreation area in the seller's brochure "led buyers to believe that it was a part of common elements which involved no charge except a monthly maintenance fee." *Ibid.* As in the instant case, a sales brochure misled the purchasers.

Is the nearby presence of a toxic-waste dump a condition that materially affects the value of property? Surely, Lois Gibbs would have wanted to know that the home she was buying in Niagara Falls, New York, was within one-quarter mile of the abandoned Love Canal site. *See* Lois M. Gibbs, *Love Canal: My Story* (1982) (recounting residents' political struggle concerning leaking toxic-chemical dump near their homes). In the case of on-site conditions, courts have imposed affirmative obligations on sellers to disclose information materially affecting the value of property. *Supra,* at Part III. There is no logical reason why a certain class of sellers and brokers should not disclose off-site matters that materially affect the value of property.

We know that the physical effects of abandoned dump sites are not limited to the confines of the dump. For example, in *Ayers v. Township of Jackson*, 106 *N.J.* 557, 525 *A.*2d 287 (1987), toxic pollutants from a landfill contaminated the water supply of residents of nearby homes. In *Citizens for Equity v. New Jersey Department of Environmental Protection*, 126 *N.J.* 391, 599 *A.*2d 507 (1991), we invalidated a regulation of the New Jersey Department of Environmental Protection that prohibited an award of value-diminution damages to owners of property located *more* than one-half mile from the landfill area. Implicit in that regulation was the recognition that even without physical intrusion a landfill may cause diminution in the fair market value of real property located nearby. We agreed with the Appellate Division's determination that that regulation contravened the Sanitary Landfill Facility Closure and Contingency Fund Act, specifically *N.J.S.A.* 13:1E–106, which makes the fund liable for *all* damages proximately resulting from operations or closure of any sanitary landfill. 126 *N.J.* at 393, 599 *A.*2d 507.

In short, our precedent and policy offer reliable evidence that the value of property may be materially affected by adjacent or nearby landfills. Professional sellers in southern New Jersey could not help but have been aware of the potential effects of such conditions. *See* Cheryl Frank, *Realty and Reality: Must Toxic Dump be Revealed?*, *A.B.A.J.*, Apr. 1985, at 20; Mark Jaffe, *Waste Site Poisons a Purchase*, *Phila. Inquirer*, Sept. 5, 1983, at B1; and George Anastasia, *Settlement Ends Dispute Over House Sale Near Dump*, *Phila. Inquirer*, Mar. 5, 1985, at B1 (all discussing *ATCO Nat'l Bank v. Jackson*, No. C–3489–83, litigation begun in 1983 in Camden County Superior Court—eventually settled out of court in 1985—in which lending bank sought specific performance from family who refused to close on purchase of home near toxic landfill, and family countersued for fraudulent concealment).

In December 1983, the Real Estate Commission wrote to the Camden County Board of Realtors, stating that "[b]ecause of the potential effects on health, and because of its impact on the value

of property, location of property near a hazardous waste site is a bit of information that should be supplied to potential buyers. Difficulties in selling such property should be disclosed to potential sellers." In addition, *N.J.A.C.* 11:5–1.23(b) requires that a broker "make reasonable effort to ascertain all pertinent information concerning every property for which he accepts an agency * * *. The licensee shall reveal all information material to any transaction to his client or principal and when appropriate to any other party." Although not dispositive of the issues in this case, those sources certainly suggest that professional sellers should have been aware of some changing duty requiring them to be more forthcoming with respect to conditions affecting the value of property.

The duty that we recognize is not unlimited. We do not hold that sellers and brokers have a duty to investigate or disclose transient social conditions in the community that arguably affect the value of property. In the absence of a purchaser communicating specific needs, builders and brokers should not be held to decide whether the changing nature of a neighborhood, the presence of a group home, or the existence of a school in decline are facts material to the transaction. Rather, we root in the land the duty to disclose off-site conditions that are material to the transaction.[4] That duty is consistent with the development of our law and supported by statutory policy.

---

[4] Florida courts have noted that "a fact is material when if the representation had not been made, the contract or transaction would not have been entered into. Conversely, a representation is not material when it appears that the contract or transaction would have been entered into notwithstanding it." *Morris v. Ingraffia*, 154 *Fla.* 432, 18 *So.*2d 1, 3 (1944).

The *Restatement (Second) of Torts* § 538(2) (1977) states that a matter is material if

    (a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or

    (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.

We note that in some instances the Legislature has required disclosure of information to certain classes of home buyers. *See e.g., N.J.S.A.* 45:22A–1 to –56. However, we have previously acted in this field absent a specific legislative mandate. *See Weintraub, supra,* 64 *N.J.* 445, 317 *A.*2d 68; *McDonald, supra,* 79 *N.J.* 275, 398 *A.*2d 1283; *Schipper, supra,* 44 *N.J.* 70, 207 *A.*2d 314. The Legislature will often refine the contours of a judicially-imposed duty, as it did with The New Home Warranty and Builders' Registration Act, *N.J.S.A.* 46:3B–1 to –20.

We hold that a builder-developer of residential real estate or a broker representing it is not only liable to a purchaser for affirmative and intentional misrepresentation, but is also liable for nondisclosure of off-site physical conditions known to it and unknown and not readily observable by the buyer if the existence of those conditions is of sufficient materiality to affect the habitability, use, or enjoyment of the property and, therefore, render the property substantially less desirable or valuable to the objectively reasonable buyer.[5] Whether a matter not disclosed by such a builder or broker is of such materiality, and unknown and unobservable by the buyer, will depend on the facts of each case. *See Weintraub, supra,* 64 *N.J.* at 454–55, 317 *A.*2d 68 (quoting *Saporta v. Barbagelata,* 220 *Cal.App.*2d 463, 33 *Cal.Rptr.* 661, 667 (1963) (citing *Lingsch, supra,* 29 *Cal.Rptr.* at 205)).

We realize that there is considerable debate regarding the nature and extent of the hazard imposed by the Buzby Landfill. For example, defendants note that the Buzby Landfill has never been on the Superfund list or the New Jersey Priority List, both of which delineate toxic landfill sites; that much of the information on which plaintiffs rely postdates their purchase of the property; that Fox & Lazo was involved in only a portion of the sales (those between 1985 and 1986); and that some of the plaintiffs have

---

[5] Plaintiffs voluntarily dropped claims for breach of warranty of habitability. We are not fully aware of the reasons for that decision, or how it will affect their proofs on remand.

already sold their homes at a profit. Those and other facets of the case will bear on its final resolution.

Ultimately, a jury will decide whether the presence of a landfill is a factor that materially affects the value of property; whether the presence of a landfill was known by defendants and not known or readily observable by plaintiffs; and whether the presence of a landfill has indeed affected the value of plaintiffs' property. Location is the universal benchmark of the value and desirability of property. Over time the market value of the property will reflect the presence of the landfill. Professional builders and their brokers have a level of sophistication that most home buyers lack. That sophistication enables them better to assess the marketability of properties near conditions such as a landfill, a planned superhighway, or an office complex approved for construction. With that superior knowledge, such sellers have a duty to disclose to home buyers the location of off-site physical conditions that an objectively reasonable and informed buyer would deem material to the transaction, in the sense that the conditions substantially affect the value or desirability of the property.

## VI

Plaintiffs seek certification of this litigation as a class action. To qualify as a class action, a lawsuit must meet the requirements of *Rule* 4:32–1. That rule imposes four predicates for certification: "(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." 271 *N.J.Super.* at 110, 638 *A.*2d 141; *R.* 4:32–1(a).

The trial court determined that the action satisfied those four requirements. However, the trial court "felt [that] the issues were too multiple and complex for a jury that must delve into how each plaintiff understood and relied on the concealments and the fact that each house is located a different distance from the landfill." 271 *N.J.Super.* at 110, 638 *A.*2d 141. *Rule* 4:32–1(b)(3) requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only

individual members, and that a class action is superior to the other available methods for the fair and efficient adjudication of the controversy." As a result of its conclusion, the trial court refused to certify this matter as a class action.

In *In re Cadillac V8-6-4 Class Action*, 93 *N.J.* 412, 430–31, 461 *A.2d* 736 (1983), we stated:

A conclusion on the issue of [the predominance of the questions of law or fact common to the members of the class] requires an evaluation of the legal issues and the proof needed to establish them. As a matter of efficient judicial administration, the goal is to save time and money for the parties and the public and to promote consistent decisions for people with similar claims. *Fed.R.Civ.P.* 23 Advisory Committee Note, 39 *F.R.D.* 98, 102–03 (1966). Sometimes the common questions may not warrant certification of a matter as a class action, but in other cases they will be sufficient to sustain a class action even if they do not dispose of the entire matter. 7A Wright & Miller, *Federal Practice & Procedure* § 1778 at 54 (1972). If a "common nucleus of operative facts" is present, predominance may be found. *Id.* at 53. From another perspective, the basic question is whether the potential class, including absent members, seeks "to remedy a common legal grievance." 3B *Moore's Federal Practice* ¶ 23.45[2] at 23-332 (1982).

In that case we determined that numerous common issues of law or fact existed among the plaintiffs' claims, yet substantial individual issues remained. *Id.* at 431, 461 *A.2d* 736. Nonetheless, we found that "the core of the case concern[ed] common issues of fact and law," and the plaintiffs sought to redress a "common legal grievance." *Id.* at 435, 461 *A.2d* 736. Therefore, we affirmed the trial court's certification of the matter as a class action. *Id.* at 441, 461 *A.2d* 736.

Similarly, in this case, plaintiffs seek to redress a common legal grievance based on the effect of a nearby landfill, unknown to the plaintiffs, on the value or desirability of property purchased by the plaintiffs from developers and brokers who knew of the landfill. Despite potential issues of causation, reliance, and damages particular to the individual actions, the core of this case concerns common issues of fact and law. For all of those claimants who rely on the seller's duty to disclose, it would be a hollow system of justice that awarded recovery to some homeowners while denying recovery to others similarly situated.

In assessing whether class certification is the superior method for adjudication, we are also "mindful that the class action rule should be construed liberally in a case involving allegations of consumer fraud." *Id.* at 435, 461 *A*.2d 736 (citing *Riley v. New Rapids Carpet Ctr.*, 61 *N.J.* 218, 228, 294 *A*.2d 7 (1972); *Lusky v. Capasso Bros.*, 118 *N.J.Super.* 369, 373, 287 *A*.2d 736 (App.Div.), *certif. denied,* 60 *N.J.* 466, 291 *A*.2d 16 (1972)). Because the center of this litigation concerns common issues of law and fact, and a class action is the superior method for adjudication of consumer-fraud claims, we affirm the Appellate Division's determination that class certification is necessary.

While we agree that class certification is appropriate to resolve the questions of law and fact common to the class, we expect that greater definition of the common issues will be required before the matter proceeds to trial. Potential class members will have to elect to participate in the class action or continue to pursue their individual claims. *R.* 4:32–2. The trial court may have to consider whether class members, as a condition to pursuing the matter as a class action, should agree on a method for allocation of compensatory and punitive damages, although it will be difficult to ground punitive damages on an unintentional failure to disclose information. *See R.* 4:32–3(c) (referring to court's ability to impose conditions on representative parties); *In re Joint Eastern and Southern Dist. Asbestos Litig.*, 129 *B.R.* 710, 810 (E.D.N.Y. and S.D.N.Y.1991) (noting that "the inequitable allocation of punitive damages, * * * at the expense of other deserving claimants receiving compensatory damages, * * * warrants class treatment in some situations"), *vacated,* 982 *F*.2d 721 (2d Cir. 1992), *modified,* 993 *F*.2d 7 (2d Cir.1993); *State ex rel. Young v. Crookham,* 290 *Or.* 61, 618 *P*.2d 1268, 1270 (1980) (discussing agreement among plaintiffs that any punitive damages they recovered would be prorated and divided among all of them). Judicial economy would not be greatly advanced if the class action actually involves 150 individual actions for damages. However, "problems well down the road which may be pertinent to the procedures

which ultimately should govern the allocation of damages need not and should not provide a roadblock to the prompt and conditional determination of whether this suit may be properly maintained as a class action." *Herbst v. International Telephone & Telegraph Corp.*, 495 *F.*2d 1308, 1321 (2d Cir.1974). We do not now resolve such potential problems. Rather, we point out the possibility that such issues may arise. Because any judgment "will bind all members [of the class] who do not request exclusion," *R.* 4:32–2(b)(2), the class notification will have to inform potential class members of the claims that they may either surrender or maintain in the class action. In addition, class representatives should not have interests adverse to other class members. *See Cadillac, supra*, 93 *N.J.* at 425, 461 *A.*2d 736. Finally, any questions concerning an attorney's potential conflict of interest through class representation and individual representation will have to be resolved by the trial court.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, GARIBALDI, and STEIN—6.

*Opposed*—None.